OA 91   Criminal Complaint

# United States District Court

FILED

_____NORTHERN_____   DISTRICT OF _____CAILFORNIA 2009 MAR -6 P 2: 27

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>MAJID KAKAVAND<br>No. 27, 3rd Floor<br>Northern Sheikh Bahaee Street<br>Tehran, Iran | SEALED BY ORDER<br>OF THE COURT<br><br>CRIMINAL COMPLAINT<br><br>RICHARD W. WIEKING<br>CLERK<br>U.S. DISTRICT COURT<br>NO. DIST. OF CA. S.J.<br><br>Case Number: 09-70243 HRL |

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my

knowledge and belief. On or about    from Feb. 2008 to the present    in  Santa Clara                    County, in

                                      (Date)

the   Northern                    District of    California, and elsewhere                    defendant(s) did,

(Track Statutory Language of Offense)

SEE ATTACHMENT A, "LIST OF CRIMINAL VIOLATIONS" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE

in violation of Title _____ United States Code, Section(s) _____ .

SEE ATTACHMENT A

I further state that I am a(n)   Special Agent _____ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT OF TODD HARRIS IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

Continued on the attached sheet and made a part hereof:         ☒ Yes      ☐ No

Approved
As To
Form:    CANDACE KELLY
         AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

Date     3 6 09

at   SAN JOSE, CALIFORNIA
     City and State

THE HON. HOWARD R. LLOYD         U.S. MAGISTRATE JUDGE

Name & Title of Judicial Officer

Signature of Judicial Officer

AUSA's
INITIALS

DISTRICT COURT
CRIMINAL CASE PROCESSING

**ATTACHMENT A**

**LIST OF CRIMINAL VIOLATIONS COMMITTED IN THE NORTHERN DISTRICT
OF CALIFORNIA AND ELSEWHERE**

**Count One:**   Beginning as early as in or about January 2006, and continuing through the
present, MAJID KAKAVAND, and others did knowingly and willfully conspire
to export and cause the export of goods from the United States to Iran without the
required United States Department of Treasury licenses, in violation of the
International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and
1705, the Iranian Transactions Regulations (ITR), 31 C.F.R. Parts 560.203 and
560.204, and 18 U.S.C. § 371.

           MAXIMUM PENALTIES:   5 years in prison, $250,000 fine, 3 years of
                                        supervised release, $100 special assessment

**Count Two:**   Beginning as early as in or about January 2006, and continuing through the
present, MAJID KAKAVAND, and others did knowingly and willfully conspire
to defraud the United States and the United States Department of Treasury, in
violation of 18 U.S.C § 371.

           MAXIMUM PENALTIES:   5 years in prison, $250,000 fine, 3 years of
                                        supervised release, $100 special assessment

**Counts Three through Five:**

        During the periods listed below for each count, MAJID KAKAVAND, and others
did knowingly and willfully export and cause the export, and attempt to export
and cause to be exported, goods, as listed below, from the United States to Iran
without the required United States Department of Treasury licenses, and aided and
abetted the same, in violation of IEEPA, the ITR, and 18 U.S.C. § 2.

| COUNT | DATE RANGE (approximate dates) | ITEMS |
|-------|-------------------------------|-------|
| Three | August 19, 2007 to February 5, 2008 | Pressure Sensors |
| Four | December 3, 2007 to February 4, 2008 | Radiall Connectors |
| Five | January 9, 2008 to July 2, 2008 | Inductors |

        MAXIMUM PENALTIES:  20 years in prison, $1,000,000 fine, 3 years of
                                       supervised release, $100 special assessment

**Counts Six through Eight:**

During the periods listed below for each count, MAJID KAKAVAND, and others did knowingly and willfully smuggle goods from the United States and aid and abet in the same, in violation of 18 U.S.C. § 554 and 18 U.S.C. § 2.

| COUNT | DATE RANGE (approximate dates) | ITEMS |
|-------|-------------------------------|-------|
| Six | August 19, 2007 to February 5, 2008 | Pressure Sensors |
| Seven | December 3, 2007 to February 4, 2008 | Radiall Connectors |
| Eight | January 9, 2008 to July 2, 2008 | Inductors |

MAXIMUM PENALTIES:  10 years in prison, $250,000 fine, 3 years of supervised release, $100 special assessment

**Counts Nine and Ten:**

On or about the dates listed below for each count, MAJID KAKAVAND, and others did  knowingly and willfully cause materially false, fictitious, and fraudulent statements and representations to be made regarding the ultimate consignee and country of ultimate destination of shipments of goods, in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Census, in violation of 18 U.S.C. §§ 1001 and 2.

| COUNT | DATES |
|-------|-------|
| Nine | November 17, 2007 |
| Ten | March 29, 2008 |

MAXIMUM PENALTIES:  5 years in prison (8 years if the offense involves international or domestic terrorism), $250,000 fine, 3 years of supervised release, $100 special assessment

**Count Eleven:**

Beginning as early as in or about January 2006, and continuing through the present, MAJID KAKAVAND, and others did knowingly and willfully conspire to commit money laundering, specifically, to transport, transmit, and transfer a monetary instrument and funds from or through a place outside the United States to a place inside the United States with the intent to promote the carrying on of a specified unlawful activity, specifically, exporting goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of IEEPA and ITR, in violation of 18 U.S.C. § 1956(h).

2

MAXIMUM PENALTIES:  20 years in prison, $500,000 fine or twice the value of the monetary instrument involved in the transactions, 3 years of supervised release, $100 special assessment

**Counts Twelve through Fourteen:**

On or about the dates listed below for each count, MAJID KAKAVAND and others knowingly and willfully transmitted and transferred and attempted to transmit and transfer funds, as set forth more specifically below, from a place outside the United States, that is Malaysia, to a place in the United States, specifically, the Northern District of California, with the intent to promote the carrying on of specified unlawful activity, that is willfully exporting goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of IEEPA and ITR, in violation of 18 U.S.C. § 1956(a)(2)(A).

| COUNT | DATE | AMOUNT |
|-------|------|--------|
| Twelve | November 15, 2007 | $16,960.00 |
| Thirteen | January 16, 2008 | $51,425.00 |
| Fourteen | March 7, 2008 | $17,855.00 |

MAXIMUM PENALTIES:  20 years in prison, $500,000 fine or twice the value of the monetary instrument involved in the transactions, 3 years of supervised release $100 special assessment

**Count Fifteen:**

Beginning as early as in or about January 2006, and continuing through the present, MAJID KAKAVAND, and others did knowingly and willfully conspire to export and cause the export of goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and 1705, and the Iranian Transactions Regulations (ITR), 31 C.F.R. Parts 560.203 and 560.204.

MAXIMUM PENALTIES:  20 years in prison, $1,000,000 fine, 3 years of supervised release, $100 special assessment

3

# AFFIDAVIT OF TODD HARRIS IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

This affidavit is being submitted by the affiant, Special Agent Todd Harris, in support of a criminal complaint and application for an arrest warrant relating to MAJID KAKAVAND, date of birth: June 22, 1972, Iranian Passport Number I5829185, an Iranian national who resides in Iran.

I, Todd Harris, being duly sworn, hereby depose and state as follows:

There is probable cause to believe that the above-identified individual has committed the following criminal offenses in violation of United States law: (1) conspiracy to export and cause the export of goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and 1705, the Iranian Transactions Regulations (ITR), 31 C.F.R. Parts 560.203 and 560.204, and 18 U.S.C. § 371;  (2) conspiracy to defraud the United States and the United States Department of Treasury, in violation of 18 U.S.C § 371; (3) exporting and causing the export, and attempting to export and cause to be exported, goods from the United States to Iran without the required United States Department of Treasury licenses, and aiding and abetting the same, in violation of IEEPA, the ITR, and 18 U.S.C. § 2;  (4) smuggling goods from the United States and aiding and abetting the same, in violation of 18 U.S.C. § 554 and 18 U.S.C. § 2; (5) making false statements or representations and causing false statements or representations to be made in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Census, in violation of 18 U.S.C. §§ 1001 and 2; (6) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and (7)  money

1

laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).

## I.  INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent (SA) with the United States Department of

Commerce, Bureau of Industry and Security, Office of Export Enforcement (DOC/BIS/OEE),

presently assigned to the San Jose Field Office in San Jose, California.  I am a law enforcement

officer of the United States within the meaning of Section 2510(7) of Title 18 of the United

States Code, and I am authorized by law to conduct investigations and to make arrests for felony

offenses.  I have been a Special Agent with BIS/OEE since November 2006.  I have attended

advanced training seminars in export investigations provided by BIS.  Prior to my position as

Special Agent with BIS/OEE, I was a Special Agent with the United States Department of

Homeland Security, United States Immigration and Customs Enforcement (ICE) from November

2002 to November 2006.  I am a graduate of the Federal Law Enforcement Training Center's

Criminal Investigator Training Program and the ICE Special Agent Training Program, where I

received training in the investigation of crimes related to the violation of export laws.  I have a

Master's of Arts degree in International Policy Studies from Monterey Institute of International

Studies and a Bachelor of Arts degree in Political Science from Sonoma State University.

2.      As a result of my training and experience, I am familiar with federal laws and

regulations governing the export of goods and technology from the United States, including

IEEPA (50 U.S.C. §§ 1701–1706).  I am also familiar with various regulations pertaining to the

United States Treasury Department, Office of Foreign Assets Control (OFAC), including the ITR

(31 C.F.R. Part 560).  I have participated in and conducted investigations of violations of United

States export laws and regulations.   I am also familiar with the laws of conspiracy (18 U.S.C. §

371), smuggling (18 U.S.C. § 554), false statements (18 U.S.C. § 1001), conspiracy to commit

money laundering (18 U.S.C. § 1956(h)), and money laundering (18 U.S.C. § 1956(a)(2)(A)).

## II.    SOURCE OF INFORMATION CONTAINED HEREIN

3.     The statements contained in this affidavit are based on information I have learned

through my personal participation in this investigation, from oral and written reports of other law

enforcement officers, from records, documents, and other evidence obtained during this

investigation, and from my experience and training as a Special Agent.  Because this affidavit is

being submitted for the limited purpose of obtaining an arrest warrant, I have not included each

and every fact known to me concerning this investigation.  I have set forth only the facts that I

believe are necessary to establish probable cause for the authorization of the search warrant.

## III.   SUMMARY OF LAWS AND REGULATIONS

### A.     IEEPA and the ITR

4.     Pursuant to the authority under IEEPA, the President of the United States and the

executive branch have issued orders and regulations governing and prohibiting certain

transactions with Iran by United States persons or involving United States goods.  From March

9, 2006, until October 15, 2007, IEEPA, (50 U.S.C. § 1705(b)), provided as follows:

> Whoever willfully violates, or willfully attempts to violate, any license, order, or
> regulation issued under this chapter shall, upon conviction, be fined not more than
> $50,000, or, if a natural person, may be imprisoned for not more than twenty years, or
> both; and any officer, director, or agent of any corporation who knowingly participates in
> such violation may be punished by a like fine, imprisonment, or both.

On October 15, 2007, IEEPA was amended to include a conspiracy provision and an increased

fine.  Subsections (a) and (c) of the amended statute provide as follows:

3

A person who willfully violates, willfully attempts, or willfully conspires to violate, or causes a violation of any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $1,000,000..., or, if a natural person, may be imprisoned for not more than twenty years, or both.

5.    Pursuant to the Executive Order issued by President William Jefferson Clinton in 1995, the Secretary of the United States Department of Treasury, in consultation with the Secretary of State, promulgated the ITR, (31 C.F.R., Part 560). The ITR prohibits any person from exporting or causing to be exported from the United States, without a license, any good or technology without having first obtained a validated export license from the United States Department of Treasury, OFAC.

6.    Two of the specific ITR prohibitions are:

Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:

Except as otherwise authorized [by a license issued by the Office of Foreign Assets Control of the U.S. Department of Treasury (OFAC)], the exportation, ...sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited....

Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

**B.    CONSPIRACY**

7.    In addition to the conspiracy provision of IEEPA discussed in paragraph 4, above, a conspiracy to commit any offense against the United States, or to defraud the United States, is a violation of 18 U.S.C. § 371, and is punishable by 5 years in prison, and a $250,000 fine.

### C.    SMUGGLING

8.    Smuggling goods from the United States is a violation of 18 U.S.C. § 554(a), which states that it shall be unlawful for any person to "fraudulently or knowingly export[] or send[] from the United States, or attempt[] to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receive[], conceal[], buy[], sell[], or in any manner facilitate[] the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States...." A smuggling violation is punishable by 10 years in prison and a $250,000 fine.

### D.    MONEY LAUNDERING

9.    Knowingly transporting, transmitting, or transferring a monetary instrument or funds from or through a place outside the United States to a place inside the United States with the intent to promote the carrying on of a specified unlawful activity, specifically, exporting goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of IEEPA and ITR, is a violation of 18 U.S.C. § 1956(a)(2)(A). Conspiracy to do the same is a violation of 18 U.S.C. § 1956(h). Money laundering and conspiracy to commit money laundering carry a 20-year maximum term of imprisonment and a fine of $500,000, or twice the value of the monetary instrument involved in the transaction.

### E.    AIDING AND ABETTING

10.    Whoever commits an offense against the United States or aids and abets,

5

counsels, commands, induces or procures its commission, or whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal. 18 U.S.C. § 2.

**F.    EXPORT AND SHIPPING RECORDS AND FALSE STATEMENTS**

11.    Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those forms are filed electronically through the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection. A Shipper's Export Declaration ("SED") is an official document submitted to DHS in connection with export shipments from the United States.

12.    An essential and material part of the SED and AES, as well as other export filings, is information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported a) without any specific authorization from the United States government; b) with the specific authorization of validated license from the United States Department of Commerce, the United States Department of State, or the United States Department of Treasury; or c) whether the goods may not be exported from the United States.

13.    The SED or AES is equivalent to a statement to the United States government that the transaction occurred as described. The SED or AES is used by the United States Bureau of Census to collect trade statistics and by the Bureau of Industry and Security, Department of Commerce, for export control purposes.

14.    Knowingly and willfully making and causing to be made a false statement or representation in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Census is a violation of 18 U.S.C. §§ 1001 and 2.  A violation of Section 1001 is punishable by up to 5 years in prison, or 8 years, if the offense involves international or domestic terrorism, and a $250,000 fine.

## IV.    U.S. EXPORTING AND INTERNATIONAL TRADE

15.    Based on my training and experience, I am knowledgeable about the methods used to export goods from the United States to foreign countries.  Typically, a company that is either the foreign end user (end user) or a domestic/international distributor (distributor) will find a United States company that sells the commodities that it seeks, and negotiate a price.  The communication between the United States company and either the end user or distributor is often conducted via email, particularly when the distributor or end user is outside the United States. During the negotiation process, the distributor or end user may send the United States company a "request for quote" ("RFQ") or a "purchase order" ("P.O") with a suggested list of items with proposed prices.  Often, during the negotiation process, or before shipping the items to a foreign country, the United States company will ask the end user or distributor to provide the end-use and/or the name of the end-user for the commodity.  This may be an informal question asked and answered via email, or the United States company may require the end user or distributor to sign an end-use statement that certifies that the commodities will not be exported or re-exported to a country in violation of United States laws.  The United States company also must have the country of ultimate destination in order to file an SED for the shipment.  The items are typically shipped to the foreign country by a freight forwarder.  Sometimes the United States company

will choose and make arrangements for the freight forwarder, and sometimes the end user or distributor will take on this responsibility. For shipments sent by air, the freight forwarder typically fills out the air waybill for the airline, relying upon the information provided to them by the end user or distributor directly, or through the United States company.

## V.   THE INVESTIGATION

16.     In or about October, 2007, Special Agents from ICE and the affiant began an investigation of the export activities of a company called Evertop Services Sdn Bhd (Evertop Services). The affiant learned from the Companies Commission of Malaysia (CCM) that Evertop Services was established in 2005 and is registered as an "electronic and electrical components and parts merchant" with an address in Kuala Lumpur, Malaysia. The company's Directors are listed as Majid KAKAVAND (KAKAVAND), and Amir Ghasemi (Ghasemi), who are both residents of Iran. The affiant also learned from a United States company that conducted business with Evertop Services, that the company had received emails from an Alex Ramzi (Ramzi), who identified himself as the Purchasing Supervisor for Evertop Services.

17.     According to the Treasury Enforcement Communication System (TECS), KAKAVAND was previously investigated by ICE in 2006 and was suspected of being associated with an Iranian military procurement program. TECS records also indicated that in January 2006, ICE received information that KAKAVAND attempted to acquire High Capacity Line of Sight (HCLOS) military radio communication systems for the Republic of Iran.

### A.     THE EMAIL SEARCH WARRANTS

18.     During the investigation, search warrants were authorized by United States

Magistrate Judges in the Northern District of California for two Yahoo! email accounts

associated with Evertop Services: Email Account 1 and Email Account 2 (Misc. No. 3-08-

70256-JL, and Misc. 3-08-70851, respectively). These searches yielded over 17,000 messages

dating from January 2006, to December 2008, many of which had attached files. Based on the

affiant's review of the messages, KAKAVAND, Ghasemi, and Ramzi all used Email Account 1

and signed their names "Majid," "Amir," and "Alex," respectively. They used the email

accounts to communicate with United States companies, freight forwarders, and each other. In

the paragraphs below, all references to emails being sent to or from KAKAVAND, Ghasemi,

Ramzi, or Evertop Services are messages sent or received in one of these two email accounts.

### B.   EVERTOP SERVICES

19.   A significant number of email communications obtained through the execution of

the email search warrants described in paragraph 18, above, detailed the operation of

KAKAVAND's procurement network that operates out of Malaysia, Singapore, and Iran. An

email dated, February 27, 2006, detailed how KAKAVAND and his associates, Ghasemi and

Ramzi, operated businesses in Malaysia and Singapore for distribution. A portion of the email is

as follows:

> 1.   Our company is a small business office only.   There are two directors for this
> company both resident in Iran.   One is me and the other Mr. Amir Ghasemi.   This is just a
> small private company stablished[sic] in Malaysia for the sake of shipment purposes only
> as per my explanation.   It will be a very small office for one employee only.   Now we
> have a similar office in Singapore that is being managed by one employee there.

> Thanks and Regards,

> Majid

9

20.    Information from email correspondence further details KAKAVAND, Ghasemi,

and Ramzi's export smuggling scheme.  A portion of an email, entitled, "Re: [Fwd: Information

Request on your Air Fright[sic] Services-Referred from Ms. Loh" dated on March 11, 2006 is as

follows:

> Dear Sirs,
>
> Thanks for your reply.  Regarding your requested information, please note the
> followings:
>
> Company Profile:   We are a trading based company working specifically on
> electronic components and parts.  We have got several customers in south east
> asia[sic] and middle east who are mostly in Telecommunication Industries.  We
> have recently established this company in Malaysia.  Before this we handled our
> works in Singapore.  Now we have a company in Singapore and that company is
> active now.  As I've explained before, we usually work based on the orders we
> receive from our customers and we are not a stocking distributor.  We have got an
> annual turn over of app. US$7,000,000 and hence we are categorized as small
> business company.  We may have two to three shipments per based on the orders
> we have.
>
> Company Nationality:  We are Iranian.  We have also got an office in Tehran.  Of
> course as you know, our company has been registered in Malaysia.
>
> Thanks and Regards,
> Majid

## C.    EVERTOP SERVICES' CUSTOMERS

21.    Evertop Services has several customers located in Iran who have received United

States products.  Two entities, Iran Electronics Industry (I.E.I.) and Iran Communication

Industry (I.C.I.), were found to be Evertop Services' main customers.  The affiant screened the

name I.E.I and I.C.I against OFAC's list of Specially Designated Nationals & Blocked Persons

("SDN") and learned that on September 17, 2008, OFAC designated both I.E.I and I.C.I as

SDNs.

22.    OFAC states that an SDN is "…..a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called 'Specially Designated Nationals' or 'SDNs.' Their assets are blocked and U.S. persons are generally prohibited from dealing with them."

23.    I.E.I. is designated as an SDN for its role in Iran's nuclear and ballistic missile programs.  On September 17, 2008, OFAC stated in a public statement that, "Iran Electronics Industry (IEI) offers a diversified range of military products including electro-optics and lasers, communication equipment, telecommunication security equipment, electronic warfare equipment, new and refurbished radar tubes, and missile launchers.  IEI manufactures military tactical communication systems and also electronic field telephones and switchboards.  IEI also manufactures night vision systems and laser range finders in addition to binoculars and periscopes."

24.    OFAC designated I.C.I as an SDN for their role in Iran's nuclear and ballistic missile programs.  On September 17, 2008, OFAC issued a public statement explaining that "Iran Communication Industries (ICI) is Iran's leading manufacturer of military and civilian communication equipment and systems. ICI offers more than seventy-five products, including tactical communications and encryption systems that meet a wide range of the Iranian military's requirements."

25.    Furthermore, the affiant queried I.E.I. and I.C.I. in Risk Report, a database developed and maintained by the Wisconsin Project on Nuclear Arms Control ("WPNAC").  The

11

"WPNAC" is a private organization that collects and provides open source information to stem

the spread of nuclear and other weapons of mass destruction.  The WPNAC provides information

on the proliferation efforts of several countries, including Iran.  Information from Risk

Report revealed that on June 24, 2008, I.E.I. was listed by the European Union as an entity

linked to Iran's proliferation-sensitive nuclear activities or Iran's development of nuclear weapon

delivery systems.  Moreover, the Risk Report provided information that I.C.I. is a subsidiary of

I.E.I. and specializes in communications technology.

     26.     Several messages indicate that KAKAVAND has had business ties to ICI as far

back as 2006.  On April 24, 2006, an email with a subject line "Meeting of today- Really

difficult", was sent from KAKAVAND to a Ramzi.  The email stated the following:

> Hi Alex
>
> How are you?  I hope everything is okay.  Today I had the meeting with ICI which lasted
> for four hours.  They came here at 15:30 and left here at 19:30.  To night[sic] I'm taking
> them to Taboosh for dinner.  It was really very difficult meeting.  They need the urgent
> items as urgently as possible.  So it seems as if there is no way except for doing what they
> need.  We have to be very much in hurry.  I have promised them to ship out two orders of
> evertop within next 3 weeks.  So as you see we have a very complex work.  Anyway
> regarding this meeting, I'll speak to you when I come to Tehran.  For now they have got
> an urgent.inquiry[sic] on the followings[sic]:
>
>> 1. P/N: AT89S8252-24AI
>> Mfg: Atmel
>> Qty: 50000pcs
>> Origin: Certainly from USA with exact origin and Mfg
>> Delivery: As urgent as possible even partial shipment
>>
>> 2. P/N: BLW7
>> Mfg: Philips
>> Qty: 2000 pcs
>> Origin: Certainly from Philips USA
>> Delivery: As urgent as possible even partial shipment

Please try to have offer for these within this week.

Thanks
Majid

### D.     EVERTOP SERVICES' SUPPLIERS IN THE UNITED STATES

27.     Information collected during the course of the investigation indicates that since 2006, Evertop Services has received numerous shipments from companies in the United States, located in several states including but not limited to: California, Alabama, Florida, Washington, and New Jersey.  These companies manufacture or distribute United States origin products for commercial/military systems using electronics and for aviation/aerospace industry.

### E.     EVERTOP SERVICES' FREIGHT FORWARDER: K LINE LOGISTICS

28.     K Line Logistics (hereinafter, K Line) is a global freight forwarder headquartered in Tokyo, Japan, with overseas agents/offices all over the world, including agents and offices in the United States, and Malaysia.  K Line performs international air or sea freight forwarding, customs clearance, distribution, and land transport services.

29.     Based on the affiant's review of the emails obtained in the search warrants, as well as K Line's business records, Evertop Services utilized K Line exclusively as their freight forwarder to ship goods from Malaysia to Iran.

### F.     LICENSING

30.     At no time did KAKAVAND, Evertop Services, Ghasemi, or Ramzi apply for, receive, or possesses a license or authorization from the Office of Foreign Assets Control (OFAC), United States Department of Treasury, to export or re-export goods, technology, or services, of any description to Iran.

13

G.     **KAKAVAND AND EVERTOP SERVICES' BUSINESS PRACTICE**

31.    The investigation revealed that KAKAVAND and Ghasemi established the

company Evertop Services in Malaysia for the purpose of procuring goods from the United

States and Europe and then exporting those goods to their customers in Iran.

32.    The affiant's review of the emails seized from the search warrants revealed that

Ramzi was the individual who contacted companies in the United States to purchase electronic

and avionic components, such as capacitors, resistors, sensors, connectors, measurement

systems, reflectometers, GPS systems, airborne antennas, and rivets.  During the process of

procuring these items, Ramzi sent emails with requests for quote (RFQs) and purchase orders to

companies in the United States.  During the negotiation process, Ramzi advised the United States

companies that the end user for the products was in Malaysia and that the products would not be

trans-shipped to any third parties.

33.    Once the negotiation was complete, Ramzi or KAKAVAND arranged for a

payment to be made to the United States company by sending wire transfers directly to the

accounts of the United States companies.

34.    Ramzi or KAKAVAND then directed the United States companies or the freight

forwarders in the United States to ship the items to Evertop Services in Kuala Lumpur, Malaysia,

care of K Line.

35.    Once the transaction with a United States Company was completed,

KAKAVAND would direct K Line to ship the items received from the United States companies

to Evertop Services' customers in Iran, via IranAir.

36.    By concealing from the United States companies that the ultimate end-users for

the items purchased by Evertop Services were in Iran, KAKAVAND, Ramzi and Ghasemi

caused materially false, misleading and incomplete information to be placed in documents and

air waybills, and AES and SED records, specifically, that the end-user was in Malaysia and that

no license was required to ship the items.

### H.   INDIVIDUAL SHIPMENTS

37.    The following section details the evidence regarding certain shipments of United

States origin goods that KAKAVAND, Ghasemi, Ramzi, and Evertop Services shipped from the

United States to Iran.  However, it is not an exhaustive list of the shipments they made.  From

February 2006, through the present, KAKAVAND, Ghasemi, Ramzi, and Evertop Services

exported over 30 shipments of goods from the United States to Iran in violation of United States

laws and regulations.

### 1.   NEW JERSEY COMPANY ORDER

38.    On or about December 12, 2006, Ramzi sent an email to a United States company

located in Northvale, New Jersey (hereinafter "New Jersey Company"), entitled "RE: Purchase

Order Ref No. 06-16-ET-121" referring to an order that Evertop Services had placed with the

New Jersey Company.  The email contained two attached files named, "06-16-ET-121-NY.doc"

and "exportenduser.DOC".  The first file was a purchase order on Evertop Services letterhead

issued to the New Jersey Company that requested the purchase of 1000 capacitors and 400

resistors for a total value of $7,046.50.  The second file was an Export End User Form signed,

"Alex" on December 12, 2006, that listed, among other things, the end user for PO 06-16-ET-

121, as Evertop Services in Malaysia.  By signing the form, "Alex" (Ramzi) certified that, "no

item purchased from [Evertop Services] will be exported or Reexported diverted or transshipped

15

via any embargoed countries."

39.     On or about March 8, 2007, the New Jersey Company filed an SED that indicated that "Evertop K Line," located in Malaysia, was the ultimate consignee of the $7,046 worth of resistors and capacitors being shipped from New Jersey to Malaysia, and that for each of the items being shipped, no license was required.

40.     On March 14, 2007, KAKAVAND sent an email to K Line in Malaysia, with the subject line, "Invoice for your next shipment (Goods of [New Jersey Company] and DR Components)". The email advised K Line to ship the items on the attached invoice (INV-06121.pdf), which included the 1000 capacitors and 400 resistors that Evertop Services had purchased from the New Jersey Company, along with other items, to I.E.I. in Shiraz, Iran. KAKAVAND instructed K Line to send the items via IranAir.

41.     On or about March 15, 2007, K Line filed an IranAir air waybill to ship Invoice No. 06-16-ET-121 from Malaysia to I.E.I. On the same date, K Line sent a scanned copy of this air waybill entitled, "awb draft.pdf," via email to KAKAVAND. The air waybill, listed "Evertop Services Sdn BHD" in the "Shipper's Name and Address" block, and "Bank Melli Iran Shiraz Branch Notifying: Iran Electronics Industries I.E.I," in the "Consignee's Name and Address" block. The IranAir air waybill also referenced invoice number, "06-16-ET-121".

### 2.     ALABAMA COMPANY ORDER

42.     On or about December 26, 2006, Ramzi sent an email to a United States company located in Huntsville, Alabama (hereinafter "Alabama Company"), with the subject line, "Purchase Order Ref No. 06-15-ET-133-AZTech". The message contained an attached file named "06-15-ET-133-AZTech.doc," which was a purchase order from Evertop Services to the

Alabama Company for an LPSR-300 Spectro Reflectometer, Solar Absorpatance Reference Puck, TEMP2000A Reflectometer/Emissionmeter, Battery Power Option, and Hemispherical Emittance calibration puck, for a total purchase price of $135,000.00.   The affiant received information from the Alabama Company that the LSPR-300 is a testing and measuring device that can be used in aerospace applications, such as, measuring a space vehicle's solar absorbtance.

43.     On or about January 6, 2007, the Alabama Company sent an email to Ramzi entitled "Re:Fwd:Re: Purcchase Order Ref No. 06-15-ET-133-AZTech," that said, "Please recognize that we will not ship an export order if the US Department of Treasury or US Department of State bans exports to the destination country or customer.  The contact/purchase order will be considered null and void if the country or customer becomes listed prior to shipment."

44.     On or about January 25, 2007, Ramzi responded to an email from the Alabama Company entitled, "Re: Purchase Order Ref No. 06-15-ET-133-[Alabama Company]," that said, "Please tell me the country that will be the final destination for the items on this order."  Ramzi responded, "We will use this equipment for our projects in Malaysia."

45.     On or about October 11, 2007, KAKAVAND sent an email to K Line requesting that when it received the goods from the Alabama company, it immediately arranged for their shipment to Tehran with the first available IranAir flight.

46.     On or about January 3, 2008, KAKAVAND issued a Commercial Invoice (INV-15-06133-2) to I.C.I. in Tehran, Iran, for one "LPSR-300 Spectro Reflectometer," valued at 88,000 Euros and one "Solar Absorptance Reference Puck Option" valued at 850 Euros.

17

47.     On or about January 3, 2008, the Alabama Company filed an SED for a shipment of $91,000 worth of electrical spectrometers and spectrographs to Evertop Services, indicating that the ultimate destination for these goods was Malaysia and that no license was required to ship them.

48.     On or about January 8, 2008, K Line filed an IranAir air waybill to ship Invoice No. 06-16-ET-33 from Evertop Services in Malaysia to I.C.I. in Iran.  On January 8, 2008, K Line sent a scanned copy of an IranAir air waybill named "DOC080108.pdf," to KAKAVAND. The air waybill listed "Evertop Services Sdn BHD" in the "Shipper's Name and Address" block and "Iran Communications Industries (I.C.I.)" in the "Consignee's Name and Address" block. The IranAir air waybill also referenced the invoice number "No. 06-15-ET-133".

### 3.     FLORIDA COMPANY SHIPMENT

49.     On or about July 21, 2007, Evertop Services placed an order with a United States company located in Deerfield Beach, Florida (hereinafter "Florida Company"), for 3500 capacitors, valued at $117,460.  According to the Florida Company's website, its "major strength has always been in military applications."

50.     On or about July 20, 2007, the Florida Company filed an SED that indicated that "EVERTOP SERVICES SDN BHD," located in Malaysia was the ultimate consignee for a shipment of $117,460 worth of "fixed capacitors" being shipped from Florida to Malaysia, and that no license was required for the shipment.

51.     On or about July 23, 2007, Evertop Services issued a Commercial Invoice (INV-15-07204-2) to I.C.I. in Tehran, Iran, for, among other items, 3500 capacitors with a value of 118,930 Euros.

### 4.   CALIFORNIA COMPANY ORDER (1)

52.   On or about August 19, 2007, Ramzi sent an email to a United States company located in Morgan Hill, California (hereinafter California Company 1), which is located in the Northern District of California, entitled, "OUR Ref. No. 07-ET-HES-116-[California Company 1]". The email contained an RFQ from Ramzi that requested prices from California Company 1 for 85 pressure sensors with part numbers, 5Cm H20-D1-P4V-MINI, 20Cm H20-D1-P4V-MINI, and 120Cm-H20-D1-P4V-MINI.

53.   On or about October 4, 2007, Ramzi sent an email with an attached file named, "07-ET-HES-116-[California Company 1].pdf", which was a purchase order on Evertop Services letterhead for the same 85 sensors listed in the August 19, 2007, RFQ with a proposed purchase price of $17,000.

54.   The affiant received information voluntarily from California Company 1 that on or about November 15, 2007, Evertop Services sent a wire transfer of $16,960.00 from its account at Maybank in Malaysia, to California Company 1's bank account at Greater Bank N.A. (now Wells Fargo), located in San Jose, California.

55.   On or about November 17, 2007, California Company 1 filed an SED for a shipment of $17,000.00 worth of sensors to Evertop Services, indicating that the ultimate destination for these goods was Malaysia and that no license was required to ship them.

56.   On or about November 22, 2007, Ghasemi sent an email to K Line entitled "RE: ACS and [California Company 1] shipment" in which he advised that "We are in a hurry for below parts. Please kindly send =arts [sic] if AWBs aren't ready."

57.   On or about November 22, 2007, K Line filed an IranAir air waybill to ship

Invoice No. INV-HES-116 from Evertop Services in Malaysia to Farazeh Tajhiz Gostar, located

in Tehran, Iran.  On or about February 5, 2008, K Line sent an email to Ghasemi entitled, "RE:

[a United States Company] and [California Company 1] shipment", contained an attached file

named, "DOC071122.tif".  The attached file was a DHL air waybill, listing "Evertop Services

Sdn BHD" in the "From(Shipper)" block and "FARZEH TAJHIZ GOSTAR" in the

"To(Receiver)" block.

### 4.     CALIFORNIA COMPANY ORDER (2)

58.     On or about December 3, 2007, Ramzi sent an email entitled, "07-15-ET-254-

APS", with an attached file named, "07-15-ET-254-[California Company 2].pdf" to a U.S.

company located in Campbell, California (hereinafter "California Company 2"), which is located

in the Northern District of California.  The attached file was a purchase order on Evertop

Services' letterhead for 41,900 Radiall Connectors with three product numbers: R114 186 000,

R141 082 000 and R210 160 020, with a proposed purchase price of $50,000.

59.     On or about January 18, 2008, Ramzi sent an email entitled, "Your TT of 51450

USD done- Please confirm receipt", to California Company 2.  The affiant received bank records

that showed that on or about January 16, 2008, Evertop Services wired $51,425.00 through

Maybank Bukit Bint to California Company 2's Wells Fargo bank account, located in Campbell,

California.

60.     On or about February 4, 2008, K Line filed an IranAir air waybill to ship Invoice

No. 07-15-ET-254 from Evertop Services in Malaysia to I.C.I. in Iran.  An email sent on

February 5, 2008, from K Line to KAKAVAND contained an attached file named,

"DOC080205-002.pdf".  The attached file was a scanned copy of an IranAir air waybill, listing

"Evertop Services Sdn BHD" in the "Shipper's Name and Address" block and "Iran Communications Industries (I.C.I.)" in the "Cosignee's Name and Address" block. The IranAir air waybill also referenced the invoice number, "No. 07-15-ET-254".

## 6.    CALIFORNIA COMPANY ORDER (3)

61.    On or about January 9, 2008, Ramzi sent an email, to a United States company, located in Milpitas, California (herinafter "California Company 3), which is located in the Northern District of California, attaching a purchase order (PO # 07-15-ET-258-EPS) for inductors. Ramzi also stated that the payment for the shipment of these items would be "Cash Prior to Shipment" and that it would be sent by wire transfer.

62.    On or about January 17, 2008, Ramzi sent an email referencing Purchase Order Ref No. 07-15-ET-258-[California Company 3], to California Company 3, attaching an end-use statement signed, "Alex," dated January 17, 2008, certifying in pertinent part that Evertop Services will not "use, transfer, export, re-export, resell or otherwise dispose of any items purchased from California Company 3 to any destination, end-user or for any end use prohibited by the laws of the United States" and that Evertop Services does not "ship to any countries that are against US laws."

63.    According to California Bank and Trust records, on or about March 7, 2008, Evertop Services, wired $17,855 from its account at Maybank in Malaysia, to California Company 3's California Bank and Trust account located in Milpitas, California.

64.    On or about March 29, 2008, California Company 3 filed an SED indicating that the ultimate consignee for the shipment of $17,875 worth of inductors being shipped from California to Malaysia, was Evertop Services in Malaysia, and that no license was required for

the shipment.

65.     On or about April 7, 2008, KAKAVAND sent an email to K Line attaching a
Commercial Invoice for I.C.I., that included, among other items, 2500 inductors, with a total
value of 16,500 Euros, and advising K Line to ship the items on the "first available Iran Air
flight." In his email, KAKAVAND indicated that the inductors were from [California Company
3].

66.     On July 2, 2008, a federal seizure warrant issued by United Stated Magistrate
Judge in the Northern District of California (Misc 3-08-70399-MEJ), based on alleged violations
of IEEPA and ITR, was served on a freight forwarder for a shipment that included, among other
items, 2500 inductors purchased by Evertop Services from California Company 3.

I.      RECENT ACTIVITES OF EVERTOP SERVICES AND KAKAVAND

67.     Information from email correspondence indicates that KAKAVAND continues to
expand his procurement network creating new intermediate companies.  A portion of an email
dated on June 12, 2008, and entitled, "New connection & relation" is as follows:

> Yesterday Alen called me & informed about the situation related to the new connections,
> Let me explain, they already started to contact through the new account which you kindly
> arranged for them [Email Account 3] and under the "B.B.I", just for your information we
> offered an Armenian name:Armen Vartanyan) and my friends using it now, so if
> somebody called and asked about Armen, you or the office employee could ask about the
> the[sic] name of the Co. & the responsible person to call back, but they'll inform us about
> the main requests in order to coordinate.

> I'll ask Mr. Majid to call you and explain to you by himself.

Moreover, an email dated May 11, 2008, indicates that KAKAVAND sought to create a new
company in Malaysia as he instructed an associate to check the availability of business  names
registered in Malaysia.  A portion of the email is as follows:

Per our tel speaking below please find the names with their priorities:

1. Vertex Technology Sdn Bhd
2. Zenith Technology Sdn Bhd
3. Summit Technology Sdn Bhd
4. Microsun Technology Sdn Bhd

The priorities are as per the numbers above from 1 to 4.

Please check and upon availability, please prepare the forms until we can sign them. I'll speak to you tomorrow afternoon to take the revised forms and sign for rest of the works.

Regards
Majid

68.      In addition to creating new intermediate companies, KAKAVAND and Evertop Services appear active in attempting to acquire United States origin items. On November 12, 2008, the affiant received information from a United States Company located in Flemington, New Jersery (hereinafter "New Jersey Company 2"), that indicated Evertop Services is continuing to seek and acquire United States origin technology. The affiant was informed by a representative of New Jersey Company 2, that it had received sales orders through its Australian representative in which the end user was Evertop Services and the ultimate destination for the goods was reported to be Malaysia.

## CONCLUSION

69.      Based on the facts set forth herein, and on my experience and training in investigating cases involving violations of federal law, I submit there is probable cause to believe that MAJID KAKAVAND has committed the following offenses: (1) conspiracy to (a) export and cause the export of goods from the United States to Iran without the required United States Department of Treasury licenses, and (b) to defraud the United States and the United States Department of Treasury, in violation of IEEPA, 50 U.S.C. §§ 1702 and 1705, the ITR, 31 C.F.R.

23

Parts 560.203 and 560.204, and 18 U.S.C. § 371; (2) conspiracy to export and cause the export of

goods from the United States to Iran without the required United States Department of Treasury

licenses, in violation of IEEPA, 50 U.S.C. §§ 1702 and 1705 and the ITR, 31 C.F.R. Parts

560.203 and 560.204; (3) knowingly and willfully exporting and causing the export, and

attempting to export and cause to be exported, goods from the United States to Iran without the

required United States Department of Treasury licenses, and aiding and abetting the same, in

violation of IEEPA, 50 U.S.C. §§ 1702 and 1705; the ITR, 31 C.F.R. Parts 560.203 and 560.204;

and 18 U.S.C. § 2; (4) knowingly and fraudulently exporting or sending merchandise, articles

and objects from the United States and attempting to do the same, contrary to any United States

law or regulation, and aiding and abetting the same, in violation of 18 U.S.C. § 554; and 18

U.S.C. § 2; (5) knowingly and willfully making and causing to be made false statements or

representations in a matter within the jurisdiction of the United States Department of Commerce

and the United States Department of Census, in violation of 18 U.S.C. §§ 1001 and 2; (6)

conspiracy to transport, transmit, and transfer a monetary instrument and funds from or through a

place outside the United States to a place inside the United States with the intent to promote the

carrying on of a specified unlawful activity, specifically, exporting goods from the United States

to Iran without the required United States Department of Treasury licenses, in violation of

IEEPA and ITR, in violation of 18 U.S.C. 1956(h); and (7)  knowingly transporting, transmitting,

and transferring a monetary instrument and funds from or through a place outside the United

States to a place inside the United States with the intent to promote the carrying on of a specified

unlawful activity, specifically, exporting goods from the United States to Iran without the

required United States Department of Treasury licenses, in violation of IEEPA and ITR, in

violation of 18 U.S.C. 1956(a)(2)(A).

_____
Todd Harris, Special Agent
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement


Subscribed to and sworn before me
on this _____ day of March, 2009

_____
THE HONORABLE HOWARD R. LLOYD
United States Magistrate Judge