ORIGINAL
FILED

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

09 APR 20  AM II: 04

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO DIST OF CA S.J.

|                              |   |                                  |
|------------------------------|---|----------------------------------|
| UNITED STATES OF AMERICA     | ) |                                  |
|                              | ) |                                  |
| v.                           | ) | No. CR 09-00357-03-RMW  (HRL)    |
|                              | ) |                                  |
| MAJID KAKAVAND               | ) |                                  |
|                              | ) |                                  |
|                              | ) |                                  |

### AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION

I, Candace Kelly, being duly sworn, depose and state:

1.  I am a citizen of the United States of America, residing in San Francisco, California.

2.  From May 2000 until the present, I have been employed by the United States Department of Justice as an Assistant United States Attorney for the Northern District of California.

3.  As an Assistant U.S. Attorney, I am responsible for the preparation and prosecution of criminal cases.  In the course of my duties I have become familiar with the charges and the evidence in the case of United States v. Majid Kakavand.

4.  An investigation by the United States Department of Commerce and the United States Immigration and Customs Enforcement revealed that the subject of this extradition request, Majid Kakavand (Kakavand), and his co-defendant Amir Ghasemi (Ghasemi) established a company called Evertop Services SND BHD in Malaysia for the purpose of procuring goods from the

1

United States and Europe and then exporting those goods to customers in Iran without first obtaining the required export licenses from the United States Department of the Treasury. The particular goods in this case were electronic and electrical components and parts. Kakavand and his co-conspirators were sending these goods to entities in Iran that are engaged in military tactical communications and encryption systems, and other military equipment and systems. In order to conceal that the ultimate destination of the goods was Iran, which would require a United States export license, Kakavand and his co-conspirators sent the goods to a freight forwarder in Malaysia, and then re-exported them to Iran. This illegal export scheme began as early as January 2006 and continued through at least April 7, 2009.

Emails seized pursuant to two email search warrants executed during the investigation revealed that Kakavand, Ghasemi, and their co-defendant, Alex Ramzi, conducted their business using emails to communicate with United States companies, their customers in Iran, their freight forwarder, and each other. The emails revealed that the three co-conspirators shared the same email accounts and signed their messages with their first names. Each of the co-conspirators performed

essential acts in furtherance of the illegal export scheme using the email accounts.

Ramzi's primary role was to communicate with the United States companies using one of the shared email accounts. Ramzi contacted companies in the United States to purchase electronic components, such as capacitors, resistors, sensors, connectors, measurement systems, reflectometers, GPS systems, airborne antennas, and rivets. During the process of procuring these items, Ramzi sent emails with requests for quote and purchase orders to companies in the United States. During the negotiation process, Ramzi stated to the United States companies that the end user for the products was in Malaysia and that the products would not be transshipped to any third parties.

Once the negotiation was complete, Kakavand and his co-conspirators sent a wire transfer from the Evertop Services bank account in Malaysia directly to the accounts of the United States companies. According to bank records, Kakavand and Ghasemi were the only two signatories on the Evertop Services account.

Ramzi, Kakavand or Ghasemi, using one of the email accounts, then directed the United States companies or the freight forwarders in the United States to ship the items to Evertop Services in Kuala Lumpur, Malaysia, in care of K Line Logistics (K Line). K Line is a freight forwarder that Evertop

Services used exclusively to ship their goods from Malaysia to Iran.

The United States companies and/or the freight forwarders were required to file a Shipper's Export Declaration for each of the overseas shipments. By concealing from the United States companies that the ultimate end-users for the items purchased by Evertop Services were in Iran, Kakavand and his co-conspirators caused the United States companies and/or the freight forwarders in the United States to fill out the Shipper's Export Declarations with false information, specifically, that the end-user for the goods was in Malaysia and that no license was required to ship the items.

Once a transaction with a United States company was completed, and the goods were shipped to K Line in Malaysia, Kakavand or Ghasemi directed K Line to ship the items received from the United States companies to Evertop Services' customers in Iran, via IranAir.

Evertop's two main customers were Iran Electronics Industry, a company that offered a diversified range of military products, and Iran Communication Industries, Iran's leading manufacturer of military and civilian communication equipment systems.

Overall, there were at least 30 shipments from the

4

United States to Iran during the conspiracy, with combined purchase prices of approximately $1,187,212.

5.    On March 6, 2009, United States Magistrate Judge Howard R. Lloyd of the United States District Court for the Northern District of California signed a criminal complaint in the case of United States v. Majid Kakavand, case number CR 09-70243 HRL charging   Kakavand with:

(a) conspiracy to (i) export goods without a license, and (ii) to defraud the United States (50 U.S.C. §§ 1702 and 1705, 31 C.F.R. Parts 560.203 and 560.204, and 18 U.S.C. § 371);

(b) conspiracy to export goods without a license (50 U.S.C. §§ 1702 and 1705 and 31 C.F.R. Parts 560.203 and 560.204);

(c) exporting and attempting to export goods without a license and aiding and abetting the same (50 U.S.C. §§ 1702 and 1705; 31 C.F.R. Parts 560.203 and 560.204; and 18 U.S.C. § 2);

(d) smuggling goods and aiding and abetting the same (18 U.S.C. §§ 554 and 2);

(e) false statements, and aiding and abetting the same (18 U.S.C. §§ 1001 and 2);

(f) conspiracy to commit money laundering (18 U.S.C. §§ 1956(h) and (a)(2)(A); and

(g) money laundering (18 U.S.C. § 1956(a)(2)(A)).

On March 6, 2009, Magistrate Judge Lloyd issued a warrant for the arrest of Kakavand for these offenses. It is the practice in the U.S. District Court for the Northern District of California for the Clerk of Courts to retain the originals of all complaints, indictments, and warrants of arrest. Therefore, I have obtained true and accurate copies of the complaint and arrest warrant described above from the Clerk of Courts and have attached them to this affidavit as Exhibits 1 and 2.

The arrest warrant issued by Judge Lloyd on March 6, 2009, based on the charges in the complaint, was the basis for a provisional arrest request to France. Pursuant to that provisional arrest request, Kakavand was arrested in France on March 20, 2009, and remains detained pending extradition to the United States.

6.    On April 7, 2009, a federal grand jury, sitting in San Francisco, California, issued a criminal indictment charging Kakavand and others with:

(a) conspiracy to export goods without a license (50 U.S.C. §§ 1702 and 1705, and 31 C.F.R. Parts 560.203 and 560.204)(Count One);

(b) exporting goods and attempting to export goods without a license, and aiding and abetting the same (50 U.S.C. §§ 1702

6

and 1705; 31 C.F.R. Parts 560.203 and 560.204; and 18 U.S.C. § 2)(Counts Two through Four);

(c) conspiracy to commit money laundering (18 U.S.C. §§ 1956(h) and (a)(2)(A))(Count Five);

(d) money laundering, and aiding and abetting the same (18 U.S.C. §§ 1956(a)(2)(A) and 2)(Counts Six though Eight); smuggling goods (18 U.S.C. §§ 554 and 2)(Counts Nine through Eleven);

(e) conspiracy to defraud the United States (18 U.S.C. § 371) (Count Twelve); and

(f) false statements, and aiding and abetting the same (18 U.S.C. §§ 1001 and 2)(Counts Thirteen through Fifteen).

7. An indictment is a formal accusation or charging document issued by a grand jury, which is a part of the judicial branch of the U.S. government. A grand jury consists of 16 to 23 citizens impaneled to review evidence of crimes presented to it by United States law enforcement authorities. Each member of the grand jury must review the evidence presented and determine whether there is probable cause to believe that a crime has been committed and that it is likely that the defendant committed the crime. The grand jury may return an indictment charging the defendant with a crime when at least 12 grand jurors determine that it is more likely than not that the defendant committed the

crime. After an indictment is returned, the court will normally issue a warrant for the arrest of the defendant.

I have obtained a true and accurate copy of this indictment from the Clerk of Courts, and attached it to this affidavit as Exhibit 3. On April 7, 2009, United States Magistrate Judge Zimmerman authorized a no bail warrant for the arrest of Kakavand for the offenses charged in the indictment. It is the practice of this district to have a Magistrate Judge authorize arrest warrants based on indictments, but to have the Clerk of the Court, or his deputy prepare and sign the warrants. In this case, following the practice of this district, Deputy Clerk Cita F. Escolano signed the warrant. I have obtained a true and accurate copy of that arrest warrant from the Clerk of Courts, and attached it to this affidavit as Exhibit 4.

The statutes cited in the indictment and those applicable to this case are: conspiracy to export goods without a license (50 U.S.C. §§ 1702 and 1705, and 31 C.F.R. Parts 560.203 and 560.204); exporting goods without a license and aiding and abetting the same (50 U.S.C. §§ 1702 and 1705; 31 C.F.R. Parts 560.203 and 560.204 and 18 U.S.C. § 2); conspiracy to commit money laundering (18 U.S.C. §§ 1956(h) and 1956(a)(2)(A)); money laundering and aiding and abetting the same (18 U.S.C.

§§ 1956(a)(2)(A) and 2); smuggling goods (18 U.S.C. §§ 554 and
2); conspiracy to defraud the United States (18 U.S.C. § 371);
and false statements (18 U.S.C. §§ 1001 and 2).  A violation of
these statutes is a felony under United States law.  Each of
these statutes was the duly enacted law of the United States at
the time that the offenses were committed, at the time the
indictment was filed, and is now in effect.[1]  Copies of these
statutes are attached as Exhibit 5.

      The indictment in this case replaces the criminal
complaint that was previously filed against Kakavand.  The
illegal conduct with which Kakavand is charged in the indictment
is essentially identical to the conduct previously charged in the
complaint.  All of the criminal violations charged against
Kakavand in the indictment were also charged against him in the
complaint, except one.  Count Fourteen in the indictment charges
one additional instance of causing a false statement to be made

---

[1]  While Title 50, United States Code, Section 1705 was enacted
at the time of the offense, this statute was amended in October
2007, subsequent to the commission of some of the acts of the
conspiracy, to include conspiracy language and increase the
financial penalty from $50,000 to $1,00,000.  Under United States
law, the crime of conspiracy is a continuing crime and therefore,
because the charged conspiracy in this case continued into the
period of time for which there was a statute penalizing
conspiracy, the amended statute controls.

in a shipper's export declaration that was not charged in the criminal complaint.

Additionally, Count One of the complaint, conspiracy to export and cause the export of goods from the United States to Iran without a license, in violation of 50 U.S.C. §§ 1702 and 1705 and 18 U.S.C. § 371, was not charged in the indictment. In the complaint, Count One and Count Fifteen both charged conspiracy to export goods from the United States to Iran without a license. The difference is that in Count One of the complaint, this conduct was charged under the general conspiracy statute (18 U.S.C. § 371) with the underlying crime being an export violation (50 U.S.C. §§ 1702 and 1705). In Count Fifteen of the complaint, which is the same as Count One of the indictment, that conduct was charged under the conspiracy provision contained within the export violation statute (50 U.S.C. §§ 1702 and 1705). In other words, there are two ways to charge the same conduct. In the complaint, it was charged under both legal theories, but in the indictment, it is charged only under one of those legal theories – as a conspiracy prohibited by Title 50, United States Code, Sections 1702 and 1705.

8. <u>Count One</u> charges Kakavand and others with conspiracy to commit a substantive offense against the United States, specifically, to export and cause the export of goods, from the

United States to Iran in violation of the embargo imposed upon that country by the United States, without having obtained the required licenses and authorizations from the United States. This is a violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations Parts 560.203 and 560.204.

Under United States law, a conspiracy is an agreement to commit one or more criminal offenses. The agreement on which the conspiracy is based need not be expressed in writing or in words, but may be simply a tacit understanding by two or more persons to do something illegal. Conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member. A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the identities of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, he is guilty of conspiracy even though he did not participate before and may play only a minor part. A conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership. Moreover, because of this partnership, statements made by a

conspirator in the course of and while he is a member of the
criminal conspiracy are admissible in evidence not only against
that conspirator, but also against all other members of the
conspiracy.  This is so because, as stated earlier, a conspirator
acts as an agent or representative of the other conspirators when
he is acting in furtherance of their illegal scheme.  Therefore,
statements of conspirators made in furtherance of the conspiracy
may be deemed to be the statements of all conspirators.

　　　The crime of conspiracy is an independent offense,
separate and distinct from the commission of any specific
"substantive crimes".  Consequently, a conspirator can be found
guilty of the crime of conspiracy to commit an offense even where
the substantive crime that was the purpose of the conspiracy is
not committed.  The Congress of the United States has deemed it
appropriate to make conspiracy, standing alone, a separate crime,
even if the conspiracy is not successful, because collective
criminal planning poses a greater threat to the public safety and
welfare than individual conduct and increases the likelihood of
success of a particular criminal venture.

　　　To satisfy its burden of proof and convict Kakavand on
Count One, the government, at trial, must establish beyond a
reasonable doubt each of the following essential elements: (1)
that two or more persons entered an agreement to commit the

underlying offense, (i.e., to export and cause to export goods from the United States to Iran without a license); and (2) that Kakavand knowingly became a member of the conspiracy to commit the underlying offense.

9.    <u>Counts Two through Four</u> charge Kakavand and others with knowingly and willfully exporting and causing the export of goods, and attempting to export and cause the export of goods from the United States to Iran in violation of the embargo imposed upon that country by the United States, without having obtained the required licenses and authorizations from the United States in violation of Title 50, United States Code, Sections 1702 and 1705, and 31 C.F.R. Parts 560.203 and 560.204.

To satisfy its burden of proof and convict Kakavand on Counts Two through Four, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) Kakavand exported, caused to be exported, and attempted to export directly or indirectly, goods to an Iranian entity; (2) such an export required a license from the Office of Foreign Assets Control (OFAC), United States Department of the Treasury; (3) Kakavand acted knowingly and willfully; and (4) Kakavand did not obtain the necessary OFAC license or authorization before conducting the transaction.

10.    <u>Count Five</u> charges Kakavand and others with conspiracy

to commit offenses against the United States, that is, to transmit and transfer funds, specifically, over $86,240, from a place outside the United States to a place in the United States with the intent to promote the carrying on of specified unlawful activity, specifically, (1) willfully exporting goods from the United States to Iran without a license in violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and (2) knowingly and fraudulently smuggling goods from the United States in violation of Title 18, United States Code, Section 554.

To satisfy its burden of proof and convict Kakavand on Count Five, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) there was an agreement between two or more individuals; (2) to transport money from a place outside the United States to or through a place inside the United States; and (3) Kakavand had the intent to promote the carrying on of a specified unlawful activity, specifically, exporting goods from the United States without a license or smuggling goods from the United States.

11. <u>Counts Six through Eight</u> charge Kakavand and others with substantive counts of money laundering, specifically, to transmit and transfer funds, from a place outside the United States to a place in the United States with the intent to promote

14

the carrying on of specified unlawful activity, specifically, (1) willfully exporting goods from the United States to Iran without a license in violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and (2) knowingly and fraudulently smuggling goods from the United States in violation of Title 18, United States Code, Section 554.

To satisfy its burden of proof and convict Kakavand on Counts Six through Eight, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) Kakavand transported money from a place outside the United States to or through a place inside the United States; and (2) Kakavand acted with the intent to promote the carrying on of a specified unlawful activity, specifically, exporting goods from the United States without a license or smuggling goods from the United States.

12. Counts Nine through Eleven charge Kakavand and others with smuggling goods from the United States, specifically, to export and send, and attempt to export and send from the United States, merchandise, articles, an objects contrary to the laws and regulations of the United States, specifically, Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of

Federal Regulations, Parts 560.203 and 560.204, in violation of
Title 18, United States Code, Sections 554 and 2.

To satisfy its burden of proof and convict Kakavand on
Counts Nine Through Eleven, the government, at trial, must
establish beyond a reasonable doubt each of the following
essential elements: (1) Kakavand fraudulently and knowingly sent
and attempted to send an object, article and merchandise from a
place inside the United States to a place outside the United
States; and (2) the sending of the object, article and
merchandise was contrary to a United States law and regulation.

13. Count Twelve charges Kakavand and others with
conspiracy to defraud the United States. Defrauding the United
States encompasses a vast array of conduct, including acts which
do not constitute a crime under a separate federal statute. It
includes conspiring to interfere with or obstruct one of the
United States' lawful governmental functions by deceit, craft,
trickery, or by dishonest means.

The government must show that the members agreed to
interfere with or obstruct one of the government's lawful
functions and that they used deceit or trickery to do so. The
government must also establish that the target of the fraud was
the United States or one of its agencies.

The government does not have to establish a pecuniary

16

loss to the United States. Moreover, the government is not required to show that the scheme to defraud was a success or that the government was actually harmed. The government is also not required to show that the fraud was a crime on its own.

To satisfy its burden of proof and convict Kakavand on Count Twelve, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) there was an agreement between two or more individuals – including Kakavand – to achieve an unlawful objective; (2) at least one of the members of the conspiracy performed at least one overt act in furtherance of the illegal purpose; and (3) Kakavand had the intent to defraud the United States.

14. <u>Counts Thirteen through Fifteen</u> charge Kakavand and others with causing false and fictitious statements to be made in a matter within the jurisdiction of the United States Department of Commerce and the United States Bureau of Census. Specifically, Kakavand and others caused statements to be made in air waybills, Automated Export System records, and Shipper's Export Declarations, which stated that (1) no license was required, and (2) the ultimate consignee was an entity located in Malaysia, when they knew that the goods were being shipped to Iran, and that a license was required for shipment. Causing

these false statements to be made was a violation of Title 18, United States Code, Sections 1001 and 2.

Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those forms are filed electronically through the Automated Export System (AES). A Shipper's Export Declaration (SED) is an official document submitted to the United States in connection with export shipments from the United States. An essential and material part of the SED and AES, as well as other export filings, is information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported a) without any specific authorization from the United States government; b) with the specific authorization of validated license from the United States Department of Commerce, the United States Department of State, or the United States Department of the Treasury; or c) whether the goods may not be exported from the United States. A statement to the SEC or AES is a statement to the United States government that the transaction occurred as described. The SED or AES is used by the United States Bureau of Census to collect trade

statistics and by the Bureau of Industry and Security, Department of Commerce, for export control purposes.

To satisfy its burden of proof and convict Kakavand on Counts Thirteen through Fifteen, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) Kakavand caused a false statement to be made in a matter within the jurisdiction of the United States Department of Commerce, and the United States Department of Census; (2) Kakavand knew that the statement was untrue; and (3) the statement was material to the Department of Commerce and the Department of Census' activities or decisions.[2]

15.   The statute of limitations on prosecuting these offenses is Section 3282 of Title 18, United States Code, which states:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

Since the applicable statute of limitations is five years, the indictment dated April 7, 2009, which charges criminal violations

---

[2]   The indictment also contains three forfeiture allegations. These allegations are not criminal charges against Kakavand, for which his extradition is sought, but instead are statutorily-required allegations that would permit forfeiture of criminal assets upon his conviction.

beginning in January 2006 and continuing to April 7, 2009, was filed within the prescribed time.

16.   Majid Kakavand is an Iranian male, born on June 22, 1972, in Tehran, Iran.  He is the holder of an Iranian passport. Attached as Exhibit 6 is the Affidavit of Special Agent Clayton Wright in Support of the Request for Extradition of Majid Kakavand, which further details the evidence against Kakavand and attaches a copy of Kakavand's passport photograph. Kakavand was provisionally arrested on March 20, 2009, in Paris, France, and is currently detained pending extradition proceedings.

17.   Each of these affidavits was sworn to before a United States Magistrate Judge legally authorized to administer an oath for this purpose.  I have thoroughly reviewed these affidavits and the attachments to them, and attest that this evidence indicates that Majid Kakavand is guilty of the offenses charged in the indictment.

_C. Kelley_
CANDACE KELLY
Assistant United States Attorney

Signed and sworn to before me this **20** day of April, 2009, at San Jose, California.

_HOWARD R. LLOYD_
HOWARD R. LLOYD
United States Magistrate Judges

20

## List of Exhibits

1. Complaint, dated March 6, 2009

2. Arrest Warrant for Complaint, date March 6, 2009

3. Indictment, dated April 7, 2009

4. Arrest Warrant for Indictment, dated April 7, 2009

5. Relevant Statutes

6. Affidavit of Special Agent Clayton Wright

OA 91  Criminal Complaint

# United States District Court

**NORTHERN** _____ **DISTRICT OF** _____ CAILFORNIA 2009 MAR -6 P 2:27

FILED

UNITED STATES OF AMERICA ~~SEALED BY ORDER~~
v.                          ~~OF THE COURT~~

MAJID KAKAVAND
No. 27, 3rd Floor
Northern Shelkh Bahaea Street
Tehran, Iran

**CRIMINAL COMPLAINT**

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO DIST. OF CA. S.J.

Case Number: **09-70243 HRL**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my

knowledge and belief. On or about from Feb. 2006 to the presen in Santa Clara _____ County, in
                                    (Date)

the Northern _____ District of California, and elsewhere _____ defendant(s) did,

(Track Statutory Language of Offense)

SEE ATTACHMENT A, "LIST OF CRIMINAL VIOLATIONS" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE

I hereby certify that the annexed
instrument is a true and correct
copy of the original filed in my
office. ATTEST FILED:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By: _____
Deputy Clerk
Date: APR 10 2009

in violation of Title _____ United States Code, Section(s) _____

SEE ATTACHMENT A

I further state that I am a(n) Special Agent _____ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT OF TODD HARRIS IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Approved
As To  CANDACE KELLY
Form:   AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

3|6|09
Date

at   SAN JOSE, CALIFORNIA
     City and State

THE HON. HOWARD R. LLOYD   U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

Signature of Judicial Officer   CSA's
                                INITIALS

DISTRICT COURT
CRIMINAL CASE PROCESSING

**ATTACHMENT A**

**LIST OF CRIMINAL VIOLATIONS COMMITTED IN THE NORTHERN DISTRICT
OF CALIFORNIA AND ELSEWHERE**

**Count One:**   Beginning as early as in or about January 2006, and continuing through the present, MAJID KAKAVAND, and others did knowingly and willfully conspire to export and cause the export of goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and 1705, the Iranian Transactions Regulations (ITR), 31 C.F.R. Parts 560.203 and 560.204, and 18 U.S.C. § 371.

> MAXIMUM PENALTIES:   5 years in prison, $250,000 fine, 3 years of supervised release, $100 special assessment

**Count Two:**   Beginning as early as in or about January 2006, and continuing through the present, MAJID KAKAVAND, and others did knowingly and willfully conspire to defraud the United States and the United States Department of Treasury, in violation of 18 U.S.C § 371.

> MAXIMUM PENALTIES:   5 years in prison, $250,000 fine, 3 years of supervised release, $100 special assessment

**Counts Three through Five:**

> During the periods listed below for each count, MAJID KAKAVAND, and others did knowingly and willfully export and cause the export, and attempt to export and cause to be exported, goods, as listed below, from the United States to Iran without the required United States Department of Treasury licenses, and aided and abetted the same, in violation of IEEPA, the ITR, and 18 U.S.C. § 2.

| COUNT | DATE RANGE (approximate dates) | ITEMS |
|---|---|---|
| Three | August 19, 2007 to February 5, 2008 | Pressure Sensors |
| Four | December 3, 2007 to February 4, 2008 | Radiall Connectors |
| Five | January 9, 2008 to July 2, 2008 | Inductors |

> MAXIMUM PENALTIES:   20 years in prison, $1,000,000 fine, 3 years of supervised release, $100 special assessment

1

**Counts Six through Eight:**

During the periods listed below for each count, MAJID KAKAVAND, and others did knowingly and willfully smuggle goods from the United States and aid and abet in the same, in violation of 18 U.S.C. § 554 and 18 U.S.C. § 2.

| COUNT | DATE RANGE (approximate dates) | ITEMS |
|-------|-------------------------------|-------|
| Six | August 19, 2007 to February 5, 2008 | Pressure Sensors |
| Seven | December 3, 2007 to February 4, 2008 | Radiall Connectors |
| Eight | January 9, 2008 to July 2, 2008 | Inductors |

MAXIMUM PENALTIES: 10 years in prison, $250,000 fine, 3 years of supervised release, $100 special assessment

**Counts Nine and Ten:**

On or about the dates listed below for each count, MAJID KAKAVAND, and others did knowingly and willfully cause materially false, fictitious, and fraudulent statements and representations to be made regarding the ultimate consignee and country of ultimate destination of shipments of goods, in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Census, in violation of 18 U.S.C. §§ 1001 and 2.

| COUNT | DATES |
|-------|-------|
| Nine | November 17, 2007 |
| Ten | March 29, 2008 |

MAXIMUM PENALTIES: 5 years in prison (8 years if the offense involves international or domestic terrorism), $250,000 fine, 3 years of supervised release, $100 special assessment

**Count Eleven:**

Beginning as early as in or about January 2006, and continuing through the present, MAJID KAKAVAND, and others did knowingly and willfully conspire to commit money laundering, specifically, to transport, transmit, and transfer a monetary instrument and funds from or through a place outside the United States to a place inside the United States with the intent to promote the carrying on of a specified unlawful activity, specifically, exporting goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of IEEPA and ITR, in violation of 18 U.S.C. § 1956(h).

2

MAXIMUM PENALTIES:   20 years in prison, $500,000 fine or twice the value of the monetary instrument involved in the transactions, 3 years of supervised release, $100 special assessment

**Counts Twelve through Fourteen:**

On or about the dates listed below for each count, MAJID KAKAVAND and others knowingly and willfully transmitted and transferred and attempted to transmit and transfer funds, as set forth more specifically below, from a place outside the United States, that is Malaysia, to a place in the United States, specifically, the Northern District of California, with the intent to promote the carrying on of specified unlawful activity, that is willfully exporting goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of IEEPA and ITR, in violation of 18 U.S.C. § 1956(a)(2)(A).

| COUNT | DATE | AMOUNT |
|---|---|---|
| Twelve | November 15, 2007 | $16,960.00 |
| Thirteen | January 16, 2008 | $51,425.00 |
| Fourteen | March 7, 2008 | $17,855.00 |

MAXIMUM PENALTIES:   20 years in prison, $500,000 fine or twice the value of the monetary instrument involved in the transactions, 3 years of supervised release $100 special assessment

**Count Fifteen:**

Beginning as early as in or about January 2006, and continuing through the present, MAJID KAKAVAND, and others did knowingly and willfully conspire to export and cause the export of goods from the United States to Iran without the required United States Department of Treasury licenses, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and 1705, and the Iranian Transactions Regulations (ITR), 31 C.F.R. Parts 560.203 and 560.204.

MAXIMUM PENALTIES:   20 years in prison, $1,000,000 fine, 3 years of supervised release, $100 special assessment

3

✎AO 442    (Rev. 10/03)  Warrant for Arrest



# UNITED STATES DISTRICT COURT

## NORTHERN   District of   CALIFORNIA

UNITED STATES OF AMERICA
V.
MAJID KAKAVAND

SEALED BY ORDER
OF THE COURT

### WARRANT FOR ARREST

Case Number: 09 - 70243 HRL

To: The United States Marshal
and any Authorized United States Officer

I hereby certify that the annexed
instrument is a true and correct copy of
the original issued in my office.
ATTEST ISSUED:
RICHARD W. WIEKING

YOU ARE HEREBY COMMANDED to arrest ___ MAJID KAKAVAND, U.S. District Court
Northern District of California
Name ___

By: _Cita F   cs_

and bring him or her forthwith to the nearest magistrate judge to answer a(n)

Date: APR 10 2009    Deputy Clerk

☐ Indictment   ☐ Information   ☒ Complaint   ☐ Order of court   ☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice

charging him or her with   (brief description of offense)

Conspiracy to export and cause the export of goods from the U.S. to Iran without the required United States Dept. of Treasury licenses, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1702 and 1705, the Iranian Transactions Regulations (ITR), 31 C.F.R. Parts 560.203 and 560.204, and 18 U.S.C. § 371; Conspiracy to defraud the U.S. and the U.S. Dept. of Treasury, (18 U.S.C. § 371); Exporting and causing the export, and attempting to export and cause to be exported, goods from the U.S. to Iran without the required U.S. Dept. of Treasury licenses, and aiding and abetting the same, (IEEPA, the ITR, and 18 U.S.C. § 2); Smuggling goods from the U.S. and aiding and abetting the same, (18 U.S.C. §§ 554 and 2); Making false statements or representations in a matter within the jurisdiction of the U.S. Dept. of Commerce and the United States Dept. of Census, (18 U.S.C. § 1001); conspiracy to commit money laundering, (18 U.S.C. § 1956(h)); and money laundering, (18 U.S.C. § 1956(a)(2)(A)).

in violation of Title _See above_ ___ United States Code, Section(s)

HOWARD R. LLOYD
Name of Issuing Officer

Signature of Issuing Officer

UNITED STATES MAGISTRATE JUDGE
Title of Issuing Officer

8 6 09 San Jose CA
Date and Location

Bail Fixed At:
NO BAIL

by: ___ Howard R. Lloyd
Name of Judicial Officer

### RETURN

This warrant was received and executed with the arrest of the above-named defendant at

ORIGINAL WARRANT HELD BY
U.S. MARSHALS, SAN JOSE
NOTIFY ABOVE OFFICE UPON ARREST
DO NOT MAKE RETURN ON THIS COPY

| TE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | |
|---|---|---|
| DATE OF ARREST | | |

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

*E-filing*

### VENUE: SAN JOSE

## CR 09        0357

### UNITED STATES OF AMERICA,

**RMW**

V.

**HRL**

## EVERTOP SERVICES SND BHD,
## AMIR GHASEMI, MAJID KAKAVAND,
## and ALEX RAMZI

I hereby certify that the annexed instrument is a true and correct copy of the original filed in my office. ATTEST FILED: RICHARD W. WIEKING Clerk, U.S. District Court Northern District of California By: _____ Deputy Clerk Date: APR 10 2009

### DEFENDANT(S).

# INDICTMENT

Conspiracy to Export Goods w/o a License (50 U.S.C. §§ 1702 & 1705 & 31 C.F.R. Parts 560.203 & 560.204); Exporting Goods w/o a License (50 U.S.C. §§ 1702 & 1705; 31 C.F.R. Parts 560.203 & 560.204; & 18 U.S.C. § 2); Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)); Money Laundering (18 U.S.C. §§ 1956(a)(2) (A) & 2); Smuggling Goods (18 U.S.C. §§ 554 & 2); Conspiracy to Defraud the U.S. (18 U.S.C. § 371); False Statements (18 U.S.C. §§ 1001 & 2); & Forfeiture (50 U.S.C. app § 2410(g), 18 U.S.C. §§ 981 (a(1(C) & 982(a)(1),& 28 U.S.C. § 2461(c))

A true bill.

_____
                                    Foreman

Filed in open court this 4-7 day of 2009

_____
                                    Clerk

Bail, $ No bail

| DOCUMENT NO. | CSA'S INITIALS |
|---|---|
| | e |
| DISTRICT COURT CRIMINAL CASE PROCESSING | |

warrants as to Ghasemi, Kakav and Ramzi

W/ D2 D3 D4

1   JOSEPH P. RUSSONIELLO (CABN 44332)
    United States Attorney

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10                             SAN JOSE DIVISION

11   UNITED STATES OF AMERICA,          )   No. CR 09 0357 HRL
                                        )
12                   Plaintiff,         )   VIOLATIONS: Conspiracy to Export Goods
                                        )   Without a License (50 U.S.C. §§ 1702 and
13                                      )   1705 and 31 C.F.R. Parts 560.203 and
                                        )   560.204); Exporting Goods Without a
14          v.                          )   License (50 U.S.C. §§ 1702 and 1705; 31
                                        )   C.F.R. Parts 560.203 and 560.204; and 18
15                                      )   U.S.C. § 2); Conspiracy to Commit Money
     EVERTOP SERVICES SND BHD,          )   Laundering (18 U.S.C. § 1956(h)); Money
16   AMIR GHASEMI,                      )   Laundering  (18 U.S.C. §§ 1956(a)(2)(A)
     MAJID KAKAVAND, and                )   and 2); Smuggling Goods (18 U.S.C. §§ 554
17   ALEX RAMZI,                        )   and 2); Conspiracy to Defraud the United
                                        )   States (18 U.S.C. § 371); False Statements
18                                      )   (18 U.S.C. §§ 1001 and 2); and Forfeiture
                     Defendants.        )   (50 U.S.C. app § 2410(g), 18 U.S.C. §§
19                                      )   981(a)(1)(C) and 982(a)(1), and 28 U.S.C.
                                        )   § 2461(c))
20                                      )
                                        )   SAN JOSE VENUE
21   _____)

22                              I N D I C T M E N T

23   The Grand Jury charges:

24          At all times relevant to this Indictment:

25                                INTRODUCTION

26          1.     Defendant EVERTOP SERVICES SND BHD (hereinafter "EVERTOP

27   SERVICES"), was a company that acted as an "electronic and electrical components and parts

28   merchant." EVERTOP SERVICES purchased electronic equipment from companies in the

     INDICTMENT

United States, and elsewhere, for customers in Iran. The registered business address for

EVERTOP was in Kuala Lumpur, Malaysia.

2.      Defendant AMIR GHASEMI (hereinafter "GHASEMI"), was a citizen and

resident of Iran, and a Director of EVERTOP SERVICES.

3.      Defendant MAJID KAKAVAND (hereinafter "KAKAVAND"), was a citizen and

resident of Iran, and a Director of EVERTOP SERVICES.

4.      Defendant ALEX RAMZI (hereinafter "RAMZI"), was the Purchasing Supervisor

and Sales Representative for EVERTOP SERVICES.

5.      The email address referred to herein as "EMAIL ADDRESS 1" was created on or

about January 10, 2006, and it was accessed primarily from Iran and Malaysia.

6.      The email address herein referred to as "EMAIL ADDRESS 2" was created on or

about October 2, 2001, and it was frequently accessed from Iran.

7.      A company herein referred to as "FREIGHT FORWARDER 1" was a freight

forwarder with offices in the United States and Kuala Lumpur, Malaysia, among other locations.

8.      Iran Electronics Industry ("I.E.I.") was an organization located in Iran that offered

a diversified range of military products including electro-optics and lasers, communication

equipment, telecommunication security equipment, electronic warfare equipment, new and

refurbished radar tubes, and missile launchers. I.E.I. manufactured military tactical

communication systems and also electronic field telephones and switchboards. I.E.I. also

manufactured night vision systems and laser range finders in addition to binoculars and

periscopes.

9.      Iran Communication Industries ("I.C.I.") was Iran's leading manufacturer of

military and civilian communication equipment and systems. I.C.I. offered tactical

communications and encryption systems that met a wide range of the Iranian military's

requirements.

The Iran Trade Embargo and the Iranian Transactions Regulations

10.     The International Emergency Economic Powers Act ("IEEPA"), Title 50, United

States Code, Sections 1701-1706, authorizes the President of the United States ("the President")

to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

11. On March 15, 1995, the President issued Executive Order 12957 finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat." Executive Order 12957, as expanded and continued by Executive Orders 12959 and 13059, was in effect at all times relevant to this Indictment.

12. Executive Orders 12959 and 13059 (collectively, with Executive Order 12957, "Executive Orders") impose economic sanctions, including a trade embargo, on Iran. Specifically, the Executive Orders prohibit among other things, the exportation, reexportation, sale or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person or within the United States that evades or avoids or has the purpose of evading or avoiding, any prohibitions set forth in the Executive Orders.

13. The Executive Orders authorize the United States Secretary of Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of Treasury promulgated the Iranian Transactions Regulations, Title 31, Code of Federal Regulations, Part 560, implementing the sanctions imposed by the Executive Orders.

14. The Iranian Transactions Regulations prohibit, among other things, the export, reexport, sale or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of Treasury, through the Office of Foreign Assets Control. These regulations further prohibit any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the Iranian Transactions Regulations, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

INDICTMENT                              3

1    15.    The Executive Orders and the Iranian Transactions Regulations were in effect at

2    all times relevant to this Indictment.

3    16.    At no time did the defendants, EVERTOP SERVICES, KAKAVAND,

4    GHASEMI, or RAMZI, apply for, receive, or possess a license or authorization from the Office

5    of Foreign Assets Control, United States Department of Treasury, to export goods, technology, or

6    services, of any description, to Iran.

7    Export and Shipping Records

8    17.    Pursuant to United States law and regulation, exporters and shippers or freight

9    forwarders are required to file certain forms and declarations concerning exports of goods and

10    technology from the United States.  Typically, those forms are filed electronically through the

11    Automated Export System ("AES") administered by the United States Department of Homeland

12    Security ("DHS"), Bureau of Customs and Border Protection.  A Shipper's Export Declaration

13    ("SED") is an official document submitted to DHS in connection with export shipments from the

14    United States.

15    18.    An essential and material part of the SED and AES, as well as other export filings,

16    is information concerning the end-user or ultimate destination of the export.  The identity of the

17    end-user may determine whether the goods may be exported a) without any specific authorization

18    from the United States government; b) with the specific authorization or validated license from

19    the United States Department of Commerce, the United States Department of State, or the United

20    States Department of Treasury; or c) whether the goods may not be exported from the United

21    States.

22    19.    The SED or AES is equivalent to a statement to the United States government that

23    the transaction occurred as described.  The SED or AES is used by the United States Bureau of

24    Census to collect trade statistics and by the Bureau of Industry and Security, Department of

25    Commerce, for export control purposes.

26    //

27    //

28    //

INDICTMENT                                    4

1    COUNT ONE: (Conspiracy to Export to an Embargoed Country) 50 U.S.C. §§ 1702 and 1705
         and 31 C.F.R. Parts 560.203 and 560.204

2

3         20.    The allegations in paragraphs 1 through 19 are incorporated and re-alleged by

     reference in this Count.

4

5         21.    Beginning as early as in or about January 2006, and continuing through the

     present, in the Northern District of California and elsewhere, the defendants,

6

7                          EVERTOP SERVICES,
                           AMIR GHASEMI,
                           MAJID KAKAVAND, and
8                          ALEX RAMZI,

9    did knowingly and willfully combine, conspire, confederate, and agree with each other and with

10   others known and unknown to the Grand Jury, to commit offenses against the United States, that

11   is, to export and cause the exportation of goods, specifically, electronic equipment, from the

12   United States to Iran in violation of the embargo imposed upon that country by the United States,

13   without having first obtained the required licenses and authorizations from the Office of Foreign

14   Assets Control, United States Department of Treasury.

15        22.    It was part of the conspiracy that GHASEMI and KAKAVAND

16   established the company EVERTOP SERVICES in Malaysia for the purpose of importing goods

17   from the United States and Europe and then exporting those goods to their customers in Iran.

18        23.    It was further part of the conspiracy that EVERTOP SERVICES, GHASEMI,

19   KAKAVAND, and RAMZI caused electronic equipment to be exported from the United States

20   to individuals and entities in Iran without obtaining a license from the Office of Foreign Asset

21   Control, United States Department of Treasury.

22        24.    It was further part of the conspiracy that GHASEMI, KAKAVAND, and RAMZI

23   all used EMAIL ACCOUNT 1 to conduct business on behalf of EVERTOP SERVICES, and

24   signed their names, "Amir," "Majid," and "Alex," respectively.  GHASEMI, KAKAVAND, and

25   RAMZI used this email account to communicate with United States companies, FREIGHT

26   FORWARDER 1, and each other.

27        25.    It was further part of the conspiracy that GHASEMI, KAKAVAND, and RAMZI

28   all used the email account EMAIL ACCOUNT 2 to conduct business on behalf of EVERTOP

INDICTMENT                                    5

1  SERVICES.  GHASEMI, KAKAVAND, and RAMZI used this email account to communicate

2  with United States companies, FREIGHT FORWARDER 1, EVERTOP SERVICES' customers

3  in Iran, and each other.

4       26.    It was further part of the conspiracy that EVERTOP SERVICES

5  and RAMZI contacted companies in the United States to purchase electronic items, such as

6  capacitors, resistors, sensors, connectors, measurement systems, reflectometers, and rivets.

7  During the procurement process, EVERTOP SERVICES and RAMZI sent emails with requests

8  for quote and purchase orders to companies in the United States.

9       27.    It was further part of the conspiracy that during the procurement process,

10  EVERTOP SERVICES and RAMZI advised the United States companies that the end user for

11  the products was in Malaysia and that the products would not be transshipped to any third parties.

12       28.    It was further part of the conspiracy that EVERTOP SERVICES, GHASEMI,

13  KAKAVAND, and RAMZI paid the United States companies for the products in United States

14  dollars by sending wire transfers directly to the accounts of the United States companies in the

15  United States.

16       29.    It was further part of the conspiracy that EVERTOP SERVICES and RAMZI

17  intentionally concealed from the companies, shippers, and freight forwarders located in the

18  United States, the ultimate end-users or consignees of the items they purchased in the United

19  States.

20       30.    It was further part of the conspiracy that EVERTOP SERVICES, KAKAVAND,

21  GHASEMI, and RAMZI caused United States companies and freight forwarders to include

22  materially false, misleading and incomplete information in documents, air waybills, and AES and

23  SED records.

24       31.    It was further part of the conspiracy that EVERTOP SERVICES and RAMZI

25  advised the United States companies and the freight forwarders in the United States to ship the

26  items to EVERTOP SERVICES in Malaysia, care of FREIGHT FORWARDER 1.

27       32.    It was further part of the conspiracy that EVERTOP SERVICES, GHASEMI, and

28  KAKAVAND sent Commercial Invoices to FREIGHT FORWARDER 1 that included the name

INDICTMENT                    6

1    of the Iranian company that was the customer for the goods, an itemized list of the items to be
2    shipped to Iran, and a price in Euros or United States dollars.
3        33.    It was further part of the conspiracy that EVERTOP SERVICES, GHASEMI, and
4    KAKAVAND directed FREIGHT FORWARDER 1 and caused FREIGHT FORWARDER 1 to
5    ship the items received from the United States companies to EVERTOP SERVICES' customers
6    in Iran, via IranAir.  In all, EVERTOP SERVICES, GHASEMI, KAKAVAND, and RAMZI
7    re-exported more than 30 shipments of goods, valued at over $1,187,212.00 that originated in the
8    United States to Iran.
9        34.    In furtherance of the conspiracy and to effect the objects thereof, within the
10   Northern District of California and elsewhere, the defendants EVERTOP SERVICES,
11   GHASEMI, KAKAVAND, RAMZI, and others, did commit and cause to be committed the
12   following overt acts, among others:

OVERT ACTS

14       a.    On or about February 26, 2006, KAKAVAND sent an email to an individual in
15   Malaysia seeking assistance in finding an employee for a company that he recently established in
16   Malaysia that traded in "electronic and electrical components and parts."  KAKAVAND stated
17   that his company "mostly import[s] goods from USA and Europe and then export them to our
18   customers in Middle East and South East Asia."
19       b.    On or about February 27, 2006, KAKAVAND sent an email to an individual in
20   Malaysia in which he stated that he and GHASEMI are the two directors for "a small private
21   company" that is established in Malaysia "for the sake of shipment purposes only."
22       c.    On or about April 24, 2006, KAKAVAND sent an email to RAMZI in which he
23   described a "very difficult meeting" that he had with "ICI."  KAKAVAND explained that "[t]hey
24   need the urgent items as urgently as possible.  So it seems as if there is no way out except for
25   doing what they need.  We have to be very much in a hurry.  I have promised them to ship out
26   two orders of evertop within next 3 weeks."  He also conveyed an "urgent inquiry" for items from
27   two specified United States companies, and asked RAMZI to have an offer for these items within
28   the week.

New Jersey Company Shipment

d.     On or about December 12, 2006, RAMZI signed his name, "Alex," on a NEW JERSEY COMPANY Export End User Form that listed, among other things, the end user for PO 06-16-ET-121 as EVERTOP SERVICES in Malaysia.  By signing the form, RAMZI certified that, "no item purchased from [EVERTOP SERVICES] will be exported or Reexported diverted or transshipped via any embargoed countries."

e.     On or about March 8, 2007, EVERTOP SERVICES and RAMZI caused NEW JERSEY COMPANY to file an SED that indicated that "EVERTOP K LINE," located in Malaysia, was the ultimate consignee for $7,046 worth of resistors and capacitors being shipped from New Jersey to Malaysia, and that for each of the items being shipped, no license was required.

f.     On March 14, 2007, KAKAVAND sent an email to FREIGHT FORWARDER 1 advising them to ship the items on the attached invoice (INV-06121.pdf), which included the 1000 capacitors and 400 resistors that EVERTOP SERVICES had purchased from NEW JERSEY COMPANY, along with other items, to I.E.I. in Shiraz, Iran.  KAKAVAND instructed FREIGHT FORWARDER 1 to send the items via IranAir.

Alabama Company Shipment

g.     On or about January 25, 2007, EVERTOP SERVICES and RAMZI responded to an email from ALABAMA COMPANY entitled, "Re: Purchase Order Ref No. 06-15-ET-133-[ALABAMA COMPANY]," that said, "Please tell me the country that will be the final destination for the items on this order."  RAMZI responded, "We will use this equipment for our projects in Malaysia."

h.     In or about December 2007, KAKAVAND directed FREIGHT FORWARDER 1 to ship the "LPSR" from ALABAMA COMPANY on the first available Iran Air flight, and indicated that the shipment was "very urgent."

i.     On or about January 3, 2008, EVERTOP SERVICES and RAMZI caused ALABAMA COMPANY to issue an SED for a shipment of $91,000 worth of electrical spectrometers and spectrographs to EVERTOP SERVICES, indicating that the ultimate

INDICTMENT                              8

1  destination for these goods was Malaysia and that no license was required to ship them.

2      j.      On or about January 3, 2008, EVERTOP SERVICES issued a Commercial

3  Invoice (INV-15-06133-2) to I.C.I. in Tehran, Iran, for one "LPSR-300 Spectro Reflectometer,"

4  valued at 88,000 Euros and one "Solar Absorptance Reference Puck Option" valued at 850

5  Euros.

6      Florida Company Shipment

7      k.      On or about July 20, 2007, EVERTOP SERVICES and RAMZI caused FLORIDA

8  COMPANY to file an SED that indicated that EVERTOP SERVICES, located in Malaysia, was

9  the ultimate consignee for a shipment of $117,460 worth of fixed capacitors being shipped from

10  FLORIDA COMPANY to Malaysia, and that no license was required for the shipment.

11      l.      On or about July 23, 2007, EVERTOP SERVICES issued a Commercial Invoice

12  (INV-15-07204-2) to I.C.I. in Tehran, Iran, for, among other items, 3500 capacitors with a value

13  of 118,930 Euros.

14      California Company 1 Shipment

15      m.      On or about November 15, 2007, EVERTOP SERVICES sent a wire transfer of

16  $16,960.00 from its account at Maybank in Malaysia, to CALIFORNIA COMPANY 1's bank

17  account at Greater Bank N.A., located in San Jose, California.

18      n.      On or about November 17, 2007, EVERTOP SERVICES and GHASEMI caused

19  CALIFORNIA COMPANY 1, located in Morgan Hill, California, to file an SED indicating that

20  EVERTOP SERVICES, located in Malaysia, was the ultimate consignee for $17,000 worth of

21  pressure measurement instruments being shipped from Alaska to Malaysia, and that no license

22  was required for the shipment.

23      o.      In or about November 2007, GHASEMI sent an email to FREIGHT

24  FORWARDER 1 entitled "RE: ACS and [CALIFORNIA COMPANY 1] shipment" in which he

25  advised that "We are in a hurry for below parts. Please kindly send =arts if AWBs aren't ready."

26      p.      On or about November 22, 2007, EVERTOP SERVICES and GHASEMI caused

27  a freight forwarder to send the sensors purchased from CALIFORNIA COMPANY 1 to Farazeh

28  Tajhiz Gostar in Iran.

INDICTMENT                                    9

California Company 2

q.    On or about December 3, 2007, EVERTOP SERVICES and RAMZI sent a Purchase Order (07-15-ET-254-APS) to CALIFORNIA COMPANY 2, located in Campbell, California, for 41,900 Radiall Connectors with three product numbers: R114 186 000, R141 082 000, and R210 160 020, with a proposed purchase price of $50,000.

r.    On or about January 16, 2008, EVERTOP SERVICES and RAMZI sent a wire transfer of $51,425.00 from EVERTOP SERVICES' account at Maybank in Malaysia to CALIFORNIA COMPANY 2's Wells Fargo bank account in Campbell, California.

s.    On or about January 26, 2008, EVERTOP SERVICES and RAMZI caused CALIFORNIA COMPANY 2 to file an SED indicating that EVERTOP SERVICES, located in Malaysia, was the ultimate consignee for $51,430 worth of electric resistor parts being shipped from Los Angeles, California to Malaysia, and that no license was required for the shipment.

California Company 3

t.    On or about January 9, 2008, RAMZI sent an email to CALIFORNIA COMPANY 3, located in Milpitas, California, attaching a purchase order (PO # 07-15-ET-258-EPS) for inductors. RAMZI also stated that the payment for the shipment of these items would be "Cash Prior to Shipment" which will be sent by wire transfer.

u.    On or about January 17, 2008, RAMZI sent an email referencing Purchase Order Ref No. 07-15-ET-258-EPS, to CALIFORNIA COMPANY 3, attaching an end-use statement signed, "Alex," dated January 17, 2008, certifying in pertinent part that EVERTOP SERVICES will not "use, transfer, export, re-export, resell or otherwise dispose of any items purchased from [CALIFORNIA COMPANY 3] to any destination, end-user or for any end use prohibited by the laws of the United States" and that EVERTOP SERVICES does not "ship to any countries that are against US laws."

v.    On or about March 7, 2008, EVERTOP SERVICES and RAMZI wired $17,855 from their account at Maybank in Malaysia, to CALIFORNIA COMPANY 3's California Bank and Trust account in Fremont, California.

w.    On or about March 29, 2008, EVERTOP SERVICES and RAMZI caused

INDICTMENT                          10

1  CALIFORNIA COMPANY 3 to file an SED indicating that the ultimate consignee for the

2  shipment of $17,875 worth of Inductors being shipped from California to Malaysia, was

3  EVERTOP SERVICES in Malaysia, and that no license was required for the shipment.

4       x.      On or about April 7, 2008, KAKAVAND sent an email to FREIGHT

5  FORWARDER 1 attaching a Commercial Invoice for I.C.I., that included, among other items,

6  2,500 inductors, with a total value of 16,500 Euros, and advising FREIGHT FORWARDER 1 to

7  ship the items on the "first available Iran Air flight." In his email, KAKAVAND indicated that

8  the inductors were from [CALIFORNIA COMPANY 3].

9       All in violation of in violation of Title 50, United States Code, Sections 1702 and 1705;

10 and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204.

11

12 COUNTS TWO THROUGH FOUR: (Exports To an Embargoed Country) 50 U.S.C. §§ 1702
                              and 1705 and 31 C.F.R. Parts 560.203 and 560.204 and 18 U.S.C. § 2

13      35.     On or about the dates listed as to each count below, in the Northern District of

14 California and elsewhere, the defendants,

15                      EVERTOP SERVICES,
16                        AMIR GHASEMI,
                       MAJID KAKAVAND, and
17                        ALEX RAMZI,

18 did knowingly and willfully violate the embargo against Iran by exporting and causing to export

19 goods, and attempting to export and cause to be exported goods, as described more fully below,

20 from the United States to Iran, without first obtaining the required licenses and authorizations

21 from the Office of Foreign Assets Control, United States Department of the Treasury.

| COUNT | DATES | GOODS | CALIFORNIA COMPANY NO. |
|-------|-------|-------|------------------------|
| TWO | August 19, 2007 to November 27, 2007 | Pressure Sensors | 1 |
| THREE | December 3, 2007 to February 5, 2008 | Radiall Connectors | 2 |
| FOUR | January 9, 2008 to July 2, 2008 | Inductors | 3 |

      All in violation of Title 50, United States Code, Sections 1702 and 1705; Title 31, Code

of Federal Regulations, Parts 560.203 and 560.204, and Title 18, United States Code, Section 2.

INDICTMENT                              11

COUNT FIVE: (Conspiracy to Commit Money Laundering)  18 U.S.C. §§ 1956(a)(2)(A) and (h)

36.    The factual allegations contained in paragraphs 1 through 19, and 22 through 34 are incorporated and re-alleged by reference in this Count.

37.    From on or about January 2006, through the present, in the Northern District of California, and elsewhere, the defendants,

EVERTOP SERVICES,<br>
AMIR GHASEMI,<br>
MAJID KAKAVAND, and<br>
ALEX RAMZI,

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, specifically, to transmit and transfer funds, specifically, over $86,240.00, from a place outside the United States to a place in the United States with the intent to promote the carrying on of specified unlawful activity, specifically, willfully exporting goods from the United States to Iran without a license in violation of Title 50, United States Code, Sections 1702 and 1705; Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and knowingly and fraudulently smuggling goods from the United States in violation of Title 18, United States Code, Section 554.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h).


COUNTS SIX THROUGH EIGHT: (Money Laundering) 18 U.S.C. §§ 1956(a)(2)(A) and 2

38.    On or about the dates listed as to each count below, in the Northern District of California and elsewhere, the defendants,

EVERTOP SERVICES,<br>
AMIR GHASEMI,<br>
MAJID KAKAVAND, and<br>
ALEX RAMZI,

and others, did transmit and transfer and attempt to transmit and transfer funds, as described more fully below for each count, from a place outside the United States, that is Malaysia, to a place in the United States, that is California, with the intent to promote the carrying on of specified unlawful activity, that is, willfully exporting goods from the United States to Iran

INDICTMENT                                              12

without a license in violation of Title 50, United States Code, Sections 1702 and 1705; Title 31,

Code of Federal Regulations, Parts 560.203 and 560.204 and knowingly and fraudulently

smuggling goods from the United States in violation of Title 18, United States Code, Section

554.

| COUNT | DATE | AMOUNT | CALIFORNIA COMPANY NO. |
|-------|------|--------|------------------------|
| SIX | November 15, 2007 | $16,960.00 | 1 |
| SEVEN | January 16, 2008 | $51,425.00 | 2 |
| EIGHT | March 7, 2008 | $17,855.00 | 3 |

In violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.


COUNTS NINE THROUGH ELEVEN: (Smuggling Goods) 18 U.S.C. §§ 554 and 2

39.     On or about the dates listed as to each count below, in the Northern District of

California and elsewhere, the defendants,

EVERTOP SERVICES,
AMIR GHASEMI,
MAJID KAKAVAND, and
ALEX RAMZI,

and others, did knowingly and fraudulently export and send, and attempt to export and send from

the United States, merchandise, articles, and objects described more fully below, contrary to the

laws and regulations of the United States, specifically, Title 50, United States Code, Sections

1702 and 1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204.

| COUNT | DATES | ITEMS | CALIFORNIA COMPANY NO. |
|-------|-------|-------|------------------------|
| NINE | August 19, 2007 to November 27, 2007 | Pressure Sensors | 1 |
| TEN | December 3, 2007 to February 5, 2008 | Radiall Connectors | 2 |
| ELEVEN | January 9, 2008 to July 2, 2008 | Inductors | 3 |

All in violation of Title 18, United States Code, Sections 554 and 2.

//

//

//

INDICTMENT                                    13

COUNT TWELVE: (Conspiracy to Defraud the United States) 18 U.S.C. § 371

40.     The allegations in paragraphs 1 through 19 and 22 through 34 are incorporated and re-alleged by reference in this Count.

41.     Beginning as early as in or about January 2006, and continuing through the present, in the Northern District of California and elsewhere, the defendants,

> EVERTOP SERVICES,
> MAJID KAKAVAND,
> AMIR GHASEMI, and
> ALEX RAMZI,

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit offenses against the United States, specifically, to defraud the Department of the Treasury and the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from the United States to Iran without authorization or a license, by deceit, craft, trickery, and dishonest means in violation of Title 18, United States Code, Section 371.

COUNTS THIRTEEN THROUGH FIFTEEN: (False Statements) 18 U.S.C. §§ 1001 and 2

42.     The allegations in paragraphs 17 through 19 are incorporated and re-alleged by reference in this Count.

43.     Beginning as early as in or about January 2006, and continuing through the present, in the Northern District of California and elsewhere, the defendants,

> EVERTOP SERVICES,
> MAJID KAKAVAND,
> AMIR GHASEMI, and
> ALEX RAMZI,

in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Census, did knowingly and willfully cause to be falsified, concealed, and covered up, by trick, scheme, and device, material facts, and caused to be made false, fictitious, and fraudulent statements and representations as to a material fact, and caused to be made and used a false writing and document knowing the same to contain false, fictitious and fraudulent

INDICTMENT                          14

entry, by causing the maintenance for inspection by the United States Department of Commerce and the United States Department of Census, false and fictitious shipping documents, including air waybills, Automated Export System records, and Shipper's Export Declarations, which stated that 1) no license was required ("NLR"), and 2) the ultimate consignee was an entity located in Malaysia, as described more fully below for each count, when the defendants there and then knew that these statements were false, the ultimate destination for the goods was Iran, and a license was required for the shipment.

| COUNT | DATE | ULTIMATE CONSIGNEE | CALIFORNIA COMPANY NO. |
|---|---|---|---|
| THIRTEEN | November 17, 2007 | Evertop Svcs Sdn Bhd C/K-line Log M'sia, Lot C24 203 Jalan Bukit Bintag Kuala Lumpur, 55100 MY | 1 |
| FOURTEEN | January 26, 2008 | Evertop Services Sdn Bhd Suite 33-01, 33fl, Menara Keck Seng Kuala Lumpur, 55100 MY | 2 |
| FIFTEEN | March 29, 2008 | Evertop Services Sdn Bhd C/O KLine Logistics Sdn Bhd Lot C24, Malaysia Airlines Klia Free Trade Zone, Sepang, 64000 MY | 3 |

In violation of Title 18, United States Code, Sections 1001 and 2.

FORFEITURE ALLEGATION ONE: (Export Forfeiture) 50 U.S.C. app § 2410(g)

44.     The factual allegations contained in Counts One through Four of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of Title 50, United States Code, app Section 2410(g).

45.     Upon a conviction of any of the offenses alleged in Counts One through Four, the defendants,

EVERTOP SERVICES,
MAJID KAKAVAND,
AMIR GHASEMI, and
ALEX RAMZI,

shall forfeit to the United States, pursuant to Title 50, United States Code, app Section 2410(g),

1   any property that was the subject of the export violations, any property that was used in the

2   export or attempted export violations, and any property which constitutes or is derived from any

3   proceeds obtained directly or indirectly as a result of the export violations, including but not

4   limited to all funds and bank accounts which facilitated the offenses.

5        46.    If any of the property described above, as a result of any act or omission of the

6   defendants:

7          a.    cannot be located upon the exercise of due diligence;

8          b.    has been transferred or sold to, or deposited with, a third party;

9          c.    has been placed beyond the jurisdiction of the court;

10         d.    has been substantially diminished in value; or

11         e.    has been commingled with other property which cannot be divided without
        difficulty;

12
13  the United States shall be entitled to forfeiture of substitute property pursuant to Title 18, United

    States Code, Section 1963.

14      All pursuant to Title 50, United States Code, app Section 2410(g).

15

16  FORFEITURE ALLEGATION TWO: (Money Laundering Forfeiture) 18 U.S.C. § 982(a)(1)

17       47.    The factual allegations contained in Counts Five through Eight of this Indictment

18  are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture

19  pursuant to the provisions of Title 18, United States Code, Section 982(a)(1).

20       48.    Upon a conviction of any of the offenses alleged in Counts Five through Eight, the

21  defendants,

22                  EVERTOP SERVICES,
                    MAJID KAKAVAND,

23                  AMIR GHASEMI, and
                    ALEX RAMZI,

24  shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all

25  right, title, and interest in property, real and personal, involved in said violation.

26       49.    If, as a result of any act or omission of the defendants, any of said property

27         a.    cannot be located upon the exercise of due diligence;

28         b.    has been transferred or sold to, or deposited with, a third party;

INDICTMENT                16

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All in violation of Title 18, United States Code, Section 982.


FORFEITURE ALLEGATION THREE:   (Forfeiture of Proceeds of Smuggled Goods)
                              18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

50.     The factual allegations contained in Counts Nine through Eleven of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

51.     Upon a conviction of any of the offenses alleged in Counts Nine through Eleven, the defendants,

EVERTOP SERVICES,
MAJID KAKAVAND,
AMIR GHASEMI, and
ALEX RAMZI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United Stated Code, Section 2461(c), any property constituting, or derived from proceeds obtained, directly or indirectly, as a result of the smuggling offenses.

52.     If any of the property described above, as a result of any act or omission of the defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty;

INDICTMENT                          17

the United States shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), incorporated by Title 18, United States Code, Section

981(b) and Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

Stated Code, Section 2461(c).

DATED:                                    A TRUE BILL.

4/7/09                                    _Foreperson signature_
                                          FOREPERSON

JOSEPH P. RUSSONIELLO
United States Attorney

_signature_

BRIAN J. STRETCH
Chief, Criminal Division

(Approved as to form: _C. Kelly_ )
                      AUSA Kelly

INDICTMENT                    18

O 442 (Rev. 5/93) Warrant for Arrest

E-FILING

# United States District Court
## Northern District of California

UNITED STATES OF AMERICA,

v.

# WARRANT FOR ARREST

## Majid Kakavand

### Case Number: CR-09-00357-03-RMW

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest _____ **Majid  Kakavand** I hereby certify that the annexed
instrument is a true and correct copy of
the original issued in my office.

and bring him or her forthwith to the nearest magistrate judge to answer a(n)

ATTEST ISSUED:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California

(X) Indictment   () Information   () Complaint

() Order of Court   () Violation Notice   () Probation Violation Petition

By: _Cita F. ____

Deputy Clerk

charging him or her with: See Below

Date: APR 10 2009

**Count 1:**    50§1702 and 1705 & 31 CFR Parts 560.203 & 560.204 - Conspiracy to Export to an Embargoed Country
**Counts 2-4:** 50§1702 and 1705 & 31 CFR Parts 560.203 & 560.204 & 18§2 - Exports to an Embargoed Country
**Count  5:**    18§1956(a)(2)(A)and (h)- Conspiracy to Commit Money Laundering
**Counts 6-8:**    18§1956(a)(2)(A) & 2-   Conspiracy to Commit Money Laundering
**Counts 9-11:** 18§554 & 2-                 Smuggling Goods
**Count 12:**    18§371-                       Conspiracy to Defraud the United States
**Counts13-15:** 18§1001& 2-                False Statements

| | |
|---|---|
| **Cita F. Escolano** | **Deputy Clerk** |
| Name of Issuing Officer | Title of Issuing Officer |
| *Cita F. Escolano* | **April 8, 2009,  San Jose, CA** |
| Signature of Issuing Officer | Date and Location |

Bail fixed at $ ____ **NO BAIL** ____          by          **Bernard Zimmerman**

Name of Judicial Officer

| RETURN | ORIGINAL WARRANT HELD BY |
|---|---|
| warrant was received and executed with the arrest of the above-named defendant at | U.S. MARSHALS, SAN JOSE |
| | NOTIFY ABOVE OFFICE UPON ARREST |
| Date received | Name and Title of Arresting Officer | Signature of Arresting Officer |
| Date of Arrest | | DO NOT MAKE RETURN ON THIS COPY |

## RELEVANT STATUTES

COUNTS ONE THROUGH FOUR

**Title 50, United States Code, Section 1705 - Penalties**

(a) Unlawful acts

It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter . . .

(c) Criminal penalty

A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

NOTE: This statute was amended in October 2007, to include conspiracy language and increase the financial penalty from $50,000 to $1,00,000. Prior to October 2007, the statute read:

Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than twenty years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

Under United States law, the crime of conspiracy is a continuing crime and therefore, because the charged conspiracy in this case continued into the period of time for which there was a statute penalizing conspiracy, the amended statute controls.

**Title 50, United States Code, Section 1702 – Presidential Authorities**

(a)(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise--

1

(A) investigate, regulate, or prohibit--

    (i) any transactions in foreign exchange,

    (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

    (iii) the importing or exporting of currency or securities,by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

## Title 50, United States Code, Section 1701 – Unusual and Extraordinary Threat; Declaration of National Emergency; Exercise of Presidential Authorities

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

**Title 31, Code of Federal Regulations, Part 560.203 - Evasions; attempts.**

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

**Title 31, Code of Federal Regulations, 560.204 -- Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran.**

Except as otherwise authorized pursuant to this part, including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

**Title 18, United States Code, Section 2 - Principals**

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3

COUNTS FIVE THROUGH EIGHT

## Title 18, United States Code, Section 1956(h) - Conspiracy to Commit Money Laundering

(h) Any person who conspires to commit any offense defined in [Section 1956] . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## Title 18, United States Code, Section 1956(a)(2)(A)  - Money Laundering

. . . (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States (A) with the intent to promote the carrying on of specified unlawful activity . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both . . .

## Title 18, United States Code, Section 2 - Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

COUNTS NINE THROUGH ELEVEN

## Title 18, United States Code, Section 554 --Smuggling Goods From the United States

(a) In general.--Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such

4

merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

## Title 18, United States Code, Section 2 - Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## COUNT TWELVE

## Title 18, United States Code, Section 371 - Conspiracy to Commit Offense or to Defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

## COUNTS THIRTEEN THROUGH FIFTEEN

## Title 18, United States Code, Section 1001 -- Statements or Entries Generally

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious,

or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

**Title 18, United States Code, Section 2 - Principals**

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

AFFIDAVIT OF CLAYTON WRIGHT IN SUPPORT OF THE REQUEST
FOR EXTRADITION OF MAJID Kakavand

I, Clayton Wright, being duly sworn, depose, and state:

1.   I am a citizen of the United States residing in the State of California.

2.   I am a Special Agent employed by the United States Immigration and Customs Enforcement (ICE).

3.   ICE conducts investigations involving crimes against the United States.  Based on my training and experience, I have become knowledgeable about the laws governing various criminal violations, particularly, violations of federal laws regarding the export of goods and technology from the United States, money laundering, fraud against the United States, false statements, smuggling, conspiracy, and aiding and abetting.

4.   My duties as a Special Agent with ICE include the investigation of Majid Kakavand (Kakavand) in the case of United States v. Majid Kakavand et. al., Case Number CR 09-0357 RMW (HRL).  As the co-case agent in the investigation, I am familiar with the facts of the investigation involving the criminal activities of Kakavand.

5.   Kakavand is charged in an indictment dated April 7, 2009, with the following offenses:

(a) conspiracy to export goods without a license (50 U.S.C. §§ 1702 and 1705, and 31 C.F.R. Parts 560.203 and 560.204)(Count One);

(b) exporting goods and attempting to export goods without a
license (50 U.S.C. §§ 1702 and 1705; 31 C.F.R. Parts 560.203
and 560.204; and 18 U.S.C. § 2)(Counts Two through Four);

(c) conspiracy to commit money laundering (18 U.S.C. §§
1956(h) and (a)(2)(A))(Count Five);

(d) money laundering and aiding and abetting the same (18
U.S.C. §§ 1956(a)(2)(A) and 2)(Counts Six though Eight);

(e) smuggling goods (18 U.S.C. §§ 554 and 2) (Counts Nine
through Eleven);

(f) conspiracy to defraud the United States (18 U.S.C. §
371) (Count Twelve); and

(g) false statements (18 U.S.C. §§ 1001 and 2)(Counts
Thirteen through Fifteen).

6.   The statements contained in this affidavit are based on
information I have learned through my personal participation in
this investigation, from oral and written reports of other law
enforcement officers, from records, documents, and other evidence
obtained during this investigation, and from my experience and
training as a Special Agent.   In addition to interviewing various
witnesses in the United States, I have reviewed email
correspondence from two different email accounts that were used
by Kakavand and his co-defendants to facilitate their crimes.
The email correspondence included numerous attachments of airway
bills, purchase orders, shipping export declarations (SEDs) and

2

invoices.  Many of these documents that were recovered through
the email accounts were also recovered from United States
companies and freight forwarders.  The SEDs were also recovered
from the Automated Export System maintained by the United States
Department of Homeland Security.  I have also reviewed bank
records, which revealed that wire transfers of money were made
from Kakavand's company's bank account in Malaysia to various
United States companies from whom Kakavand and his co-
conspirators purchased goods.  Because this affidavit is being
submitted for the limited purpose of establishing probable cause,
I have not included each and every fact known to me concerning
this investigation.  I have set forth only the facts that I
believe are necessary to establish probable cause that Kakavand
has committed the offenses set forth in the indictment.

EMAIL SEARCH WARRANTS

    7.   During the investigation, search warrants were
authorized by United States Magistrate Judges in the Northern
District of California for two email accounts associated with
Evertop Services: Email Account 1 and Email Account 2 (Misc. No.
3-08-70256-JL, and Misc. 3-08-70851, respectively).  These
searches yielded over 17,000 messages dating from January 2006,
to December 2008, many of which had attached files.  Based on the
affiant's review of the messages, Kakavand, Ghasemi, and Ramzi
all used Email Account 1 and signed their names "Majid," "Amir,"

3

and "Alex," respectively.  They used the email accounts to

communicate with United States companies, freight forwarders, and

each other.  In the paragraphs below, all references to emails

being sent to or from Kakavand, Ghasemi, Ramzi, or Evertop

Services are messages sent or received in one of these two email

accounts.

EVERTOP SERVICES

8.    The evidence obtained in the investigation revealed

that, Evertop Services was established in 2005 and is registered

as an "electronic and electrical components and parts merchant"

with an address in Kuala Lumpur, Malaysia.  The company's

Directors are listed as Kakavand, and Amir Ghasemi (Ghasemi), who

are both residents of Iran.  I also learned from United States

companies that conducted business with Evertop Services, that the

company had received emails from an Alex Ramzi (Ramzi), who

identified himself as the Purchasing Supervisor for Evertop

Services.

9.    A significant number of email communications obtained

through the execution of the email search warrants described

above detailed the operation of Kakavand's procurement network

that operates out of Malaysia, Singapore, and Iran.  An email

dated, February 27, 2006, detailed how Kakavand and his

associates, Ghasemi and Ramzi, operated businesses in Malaysia

and Singapore for distribution.  A portion of the email is as

4

follows:

> Our company is a small business office only.  There are two
> directors for this company both resident in Iran.  One is me
> and the other Mr. Amir Ghasemi.  This is just a small
> private company stablished[sic] in Malaysia for the sake of
> shipment purposes only as per my explanation.  It will be a
> very small office for one employee only.  Now we have a
> similar office in Singapore that is being managed by one
> employee there.
> Thanks and Regards,
> Majid

10.   Information from email correspondence further details

Kakavand, Ghasemi, and Ramzi's export smuggling scheme.  A

portion of an email, entitled, "Re: [Fwd: Information Request on

your Air Fright[sic] Services-Referred from Ms. Loh" dated on

March 11, 2006 is as follows:

> Dear Sirs,
>
> Thanks for your reply.  Regarding your requested
> information, please note the followings:
>
> Company Profile:  We are a trading based company working
> specifically on electronic components and parts.  We have
> got several customers in south east asia[sic] and middle
> east who are mostly in Telecommunication Industries.  We
> have recently established this company in Malaysia.  Before
> this we handled our works in Singapore.  Now we have a
> company in Singapore and that company is active now.  As
> I've explained before, we usually work based on the orders
> we receive from our customers and we are not a stocking
> distributor.  We have got an annual turn over of app.
> US$7,000,000 and hence we are categorized as small business
> company.  We may have two to three shipments per based on
> the orders we have.
>
> Company Nationality:  We are Iranian.  We have also got an
> office in Tehran.  Of course as you know, our company has
> been registered in Malaysia.
>
> Thanks and Regards,
> Majid

EVERTOP SERVICES' CUSTOMERS IN IRAN

11.  Evertop Services has several customers located in Iran who have received United States products.  Two entities, Iran Electronics Industry (I.E.I.) and Iran Communication Industry (I.C.I.), were found to be Evertop Services' main customers.  The affiant screened the name I.E.I and I.C.I against OFAC's list of Specially Designated Nationals & Blocked Persons ("SDN") and learned that on September 17, 2008, OFAC designated both I.E.I and I.C.I as SDNs.

12.  OFAC states that an SDN is ".....a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called 'Specially Designated Nationals' or 'SDNs.' Their assets are blocked and U.S. persons are generally prohibited from dealing with them."

13.  I.E.I. is designated as an SDN for its role in Iran's nuclear and ballistic missile programs.  On September 17, 2008, OFAC stated in a public statement that, "Iran Electronics Industry (IEI) offers a diversified range of military products including electro-optics and lasers, communication equipment, telecommunication security equipment, electronic warfare equipment, new and refurbished radar tubes, and missile

launchers.  IEI manufactures military tactical communication systems and also electronic field telephones and switchboards. IEI also manufactures night vision systems and laser range finders in addition to binoculars and periscopes."

14.  OFAC designated I.C.I as an SDN for their role in Iran's nuclear and ballistic missile programs.  On September 17, 2008, OFAC issued a public statement explaining that "Iran Communication Industries (ICI) is Iran's leading manufacturer of military and civilian communication equipment and systems.  ICI offers more than seventy-five products, including tactical communications and encryption systems that meet a wide range of the Iranian military's requirements."

15.  Furthermore, according to Risk Report, a database developed and maintained by the Wisconsin Project on Nuclear Arms Control ("WPNAC").  The "WPNAC" is a private organization that collects and provides open source information to stem the spread of nuclear and other weapons of mass destruction.  The WPNAC provides information on the proliferation efforts of several countries, including Iran.  Information from Risk Report revealed that on June 24, 2008, I.E.I. was listed by the European Union as an entity linked to Iran's proliferation-sensitive nuclear activities or Iran's development of nuclear weapon delivery systems.  Moreover, the Risk Report provided information that I.C.I. is a subsidiary of I.E.I. and specializes in

7

communications technology.

16. Several messages indicate that Kakavand has had business ties to ICI as far back as 2006. On April 24, 2006, an email with a subject line "Meeting of today- Really difficult", was sent from Kakavand to a Ramzi. The email stated the following:

> Hi Alex
> How are you? I hope everything is okay. Today I had the meeting with ICI which lasted for four hours. They came here at 15:30 and left here at 19:30. To night[sic] I'm taking them to Taboosh for dinner. It was really very difficult meeting. They need the urgent items as urgently as possible. So it seems as if there is no way except for doing what they need. We have to be very much in hurry. I have promised them to ship out two orders of evertop within next 3 weeks. So as you see we have a very complex work. Anyway regarding this meeting, I'll speak to you when I come to Tehran. For now they have got an urgent.inquiry[sic] on the followings[sic]:

> 1. P/N: AT89S8252-24AI
> Mfg: Atmel
> Qty: 50000pcs
> Origin: Certainly from USA with exact origin and Mfg
> Delivery: As urgent as possible even partial shipment

> 2. P/N: BLW7
> Mfg: Philips
> Qty: 2000 pcs
> Origin: Certainly from Philips USA
> Delivery: As urgent as possible even partial shipment

> Please try to have offer for these within this week.
> Thanks
> Majid

## EVERTOP SERVICES' SUPPLIERS IN THE UNITED STATES

17. Information collected during the course of the investigation indicates that since 2006, Evertop Services has

received numerous shipments from companies in the United States,
located in several states including but not limited to:
California, Alabama, Florida, Washington, and New Jersey.  These
companies manufacture or distribute United States origin products
for commercial/military systems using electronics and for
aviation/aerospace industry.  Based on my review, from January
2006 to the present, Kakavand and his co-conspirators illegally
exported over 30 shipments of goods, valued at $1,187,212.00 from
the United States to Iran.  Based on a review of bank records
obtained to date in this investigation, Kakavand and his co-
conspirators wired at least $86,240.00 from their bank in
Malaysia to the United States companies' banks in the United
States.

EVERTOP SERVICES' FREIGHT FORWARDER: K LINE LOGISTICS

    18.  K Line Logistics (hereinafter, K Line) is a global
freight forwarder headquartered in Tokyo, Japan, with overseas
agents/offices all over the world, including agents and offices
in the United States, and Malaysia.  K Line performs
international air or sea freight forwarding, customs clearance,
distribution, and land transport services.

    19.  Based on the my review of the emails obtained in the
search warrants, as well as K Line's business records, Evertop
Services utilized K Line exclusively as their freight forwarder
to ship goods from Malaysia to Iran.

9

LICENSING

20. According to the records at the Office of Foreign
Assets Control (OFAC), United States Department of Treasury, at
no time did Kakavand, Evertop Services, Ghasemi, or Ramzi apply
for, receive, or possesses a license or authorization from the
OFAC, to export or re-export goods, technology, or services, of
any description to Iran.

KAKAVAND AND EVERTOP SERVICES' BUSINESS PRACTICE

21. The investigation revealed that Kakavand and Ghasemi
established the company Evertop Services in Malaysia for the
purpose of procuring goods from the United States and Europe and
then exporting those goods to their customers in Iran.
My review of the emails seized from the search warrants revealed
that Ramzi was the individual who contacted companies in the
United States to purchase electronic and avionic components, such
as capacitors, resistors, sensors, connectors, measurement
systems, reflectometers, GPS systems, airborne antennas, and
rivets. During the process of procuring these items, Ramzi sent
emails with requests for quote (RFQs) and purchase orders to
companies in the United States. During the negotiation process,
Ramzi advised the United States companies that the end user for
the products was in Malaysia and that the products would not be
trans-shipped to any third parties. Once the negotiation was
complete, Ramzi or Kakavand arranged for a payment to be made to

10

the United States company by sending wire transfers directly to the accounts of the United States companies.

22.   Ramzi or Kakavand then directed the United States companies or the freight forwarders in the United States to ship the items to Evertop Services in Kuala Lumpur, Malaysia, care of K Line.

23.   Once the transaction with a United States Company was completed, Kakavand would direct K Line to ship the items received from the United States companies to Evertop Services' customers in Iran, via IranAir.

24.   By concealing from the United States companies that the ultimate end-users for the items purchased by Evertop Services were in Iran, Kakavand, Ramzi and Ghasemi caused materially false, misleading and incomplete information to be placed in documents and air waybills, and AES and SED records, specifically, that the end-user was in Malaysia and that no license was required to ship the items.

INDIVIDUAL SHIPMENTS

25.   The following section details the evidence regarding certain shipments of United States origin goods that Kakavand, Ghasemi, Ramzi, and Evertop Services shipped from the United States to Iran.  However, it is not an exhaustive list of the shipments they made.  From January 2006, through the present, Kakavand, Ghasemi, Ramzi, and Evertop Services exported over 30

11

shipments of goods from the United States to Iran in violation of United States laws and regulations.

NEW JERSEY COMPANY ORDER

26. On or about December 12, 2006, Ramzi sent an email to a United States company located in Northvale, New Jersey (hereinafter "New Jersey Company"), entitled "RE: Purchase Order Ref No. 06-16-ET-121" referring to an order that Evertop Services had placed with the New Jersey Company. The email contained two attached files named, "06-16-ET-121-NY.doc" and "exportenduser.DOC". The first file was a purchase order on Evertop Services letterhead issued to the New Jersey Company that requested the purchase of 1000 capacitors and 400 resistors for a total value of $7,046.50. The second file was an Export End User Form signed, "Alex" on December 12, 2006, that listed, among other things, the end user for PO 06-16-ET-121, as Evertop Services in Malaysia. By signing the form, "Alex" (Ramzi) certified that, "no item purchased from [Evertop Services] will be exported or Reexported diverted or transshipped via any embargoed countries."

27. On or about March 8, 2007, the New Jersey Company filed an SED that indicated that "Evertop K Line," located in Malaysia, was the ultimate consignee of the $7,046 worth of resistors and capacitors being shipped from New Jersey to Malaysia, and that for each of the items being shipped, no

12

license was required.

28. On March 14, 2007, Kakavand sent an email to K Line in Malaysia, with the subject line, "Invoice for your next shipment (Goods of [New Jersey Company] and DR Components)". The email advised K Line to ship the items on the attached invoice (INV-06121.pdf), which included the 1000 capacitors and 400 resistors that Evertop Services had purchased from the New Jersey Company, along with other items, to I.E.I. in Shiraz, Iran. Kakavand instructed K Line to send the items via IranAir.

29. On or about March 15, 2007, K Line filed an IranAir air waybill to ship Invoice No. 06-16-ET-121 from Malaysia to I.E.I. On the same date, K Line sent a scanned copy of this air waybill entitled, "awb draft.pdf," via email to Kakavand. The air waybill, listed "Evertop Services Sdn BHD" in the "Shipper's Name and Address" block, and "Bank Melli Iran Shiraz Branch Notifying: Iran Electronics Industries I.E.I," in the "Consignee's Name and Address" block. The IranAir air waybill also referenced invoice number, "06-16-ET-121".

ALABAMA COMPANY ORDER

30. On or about December 26, 2006, Ramzi sent an email to a United States company located in Huntsville, Alabama (hereinafter "Alabama Company"), with the subject line, "Purchase Order Ref No. 06-15-ET-133-[Alabama Company]". The message contained an attached file named "06-15-ET-133-[Alabama Company].doc," which

13

was a purchase order from Evertop Services to the Alabama Company

for an LPSR-300 Spectro Reflectometer, Solar Absorpatance

Reference Puck, TEMP2000A Reflectometer/Emissionmeter, Battery

Power Option, and Hemispherical Emittance calibration puck, for a

total purchase price of $135,000.00. Information obtained from

the Alabama Company that the LSPR-300 is a testing and measuring

device that can be used in aerospace applications, such as,

measuring a space vehicle's solar absorbtance.

31. On or about January 6, 2007, the Alabama Company sent

an email to Ramzi entitled "Re:Fwd:Re: Purcchase Order Ref No.

06-15-ET-133-[Alabama Company]" that said, "Please recognize that

we will not ship an export order if the US Department of Treasury

or US Department of State bans exports to the destination country

or customer. The contact/purchase order will be considered null

and void if the country or customer becomes listed prior to

shipment."

32. On or about January 25, 2007, Ramzi responded to an

email from the Alabama Company entitled, "Re: Purchase Order Ref

No. 06-15-ET-133-[Alabama Company]," that said, "Please tell me

the country that will be the final destination for the items on

this order." Ramzi responded, "We will use this equipment for

our projects in Malaysia."

33. On or about October 11, 2007, Kakavand sent an email to

K Line requesting that when it received the goods from the

14

Alabama company, it immediately arranged for their shipment to
Tehran with the first available IranAir flight.

34.  On or about January 3, 2008, Kakavand issued a
Commercial Invoice (INV-15-06133-2) to I.C.I. in Tehran, Iran,
for one "LPSR-300 Spectro Reflectometer," valued at 88,000 Euros
and one "Solar Absorptance Reference Puck Option" valued at 850
Euros.

35.  On or about January 3, 2008, the Alabama Company filed
an SED for a shipment of $91,000 worth of electrical
spectrometers and spectrographs to Evertop Services, indicating
that the ultimate destination for these goods was Malaysia and
that no license was required to ship them.

36.  On or about January 8, 2008, K Line filed an IranAir
air waybill to ship Invoice No. 06-16-ET-33 from Evertop Services
in Malaysia to I.C.I. in Iran.  On January 8, 2008, K Line sent a
scanned copy of an IranAir air waybill named "DOC080108.pdf," to
Kakavand. The air waybill listed "Evertop Services Sdn BHD" in
the "Shipper's Name and Address" block and "Iran Communications
Industries (I.C.I.)" in the "Consignee's Name and Address" block.
The IranAir air waybill also referenced the invoice number "No.
06-15-ET-133".

FLORIDA COMPANY SHIPMENT

37.  On or about July 21, 2007, Evertop Services placed an
order with a United States company located in Deerfield Beach,

15

Florida (hereinafter "Florida Company"), for 3500 capacitors, valued at $117,460.  According to the Florida Company's website, its "major strength has always been in military applications."

38.  On or about July 20, 2007, the Florida Company filed an SED that indicated that EVERTOP SERVICES SDN BHD, located in Malaysia was the ultimate consignee for a shipment of $117,460 worth of fixed capacitors being shipped from Florida to Malaysia, and that no license was required for the shipment.

39.  On or about July 23, 2007, Evertop Services issued a Commercial Invoice (INV-15-07204-2) to I.C.I. in Tehran, Iran, for, among other items, 3500 capacitors with a value of 118,930 Euros.

CALIFORNIA COMPANY ORDER (1)

40.  On or about August 19, 2007, Ramzi sent an email to a United States company located in Morgan Hill, California (hereinafter California Company 1), which is located in the Northern District of California, entitled, "OUR Ref. No. 07-ET-HES-116-[California Company 1]".  The email contained an RFQ from Ramzi that requested prices from California Company 1 for 85 pressure sensors with part numbers, 5Cm H20-D1-P4V-MINI, 20Cm H20-D1-P4V-MINI, and 120Cm-H20-D1-P4V-MINI.

41.  On or about October 4, 2007, Ramzi sent an email with an attached file named, "07-ET-HES-116-[California Company 1].pdf", which was a purchase order on Evertop Services

16

letterhead for the same 85 sensors listed in the August 19, 2007, RFQ with a proposed purchase price of $17,000.

42. Special Agent (SA) Todd Harris from the Department of Commerce, Bureau of Industry and Security (BIS), Office of Export Enforcement (OEE) received information voluntarily from California Company 1 that on or about November 15, 2007, Evertop Services sent a wire transfer of $16,960.00 from its account at Maybank in Malaysia, to California Company 1's bank account at Greater Bank N.A., located in San Jose, California.

43. On or about November 17, 2007, California Company 1 filed an SED for a shipment of $17,000.00 worth of sensors to Evertop Services, indicating that the ultimate destination for these goods was Malaysia and that no license was required to ship them.

44. On or about November 22, 2007, Ghasemi sent an email to K Line entitled "RE: ACS and [California Company 1] shipment" in which he advised that "We are in a hurry for below parts.  Please kindly send =arts [sic] if AWBs aren't ready."

45. On or about November 22, 2007, K Line filed an IranAir air waybill to ship Invoice No. INV-HES-116 from Evertop Services in Malaysia to Farazeh Tajhiz Gostar, located in Tehran, Iran. On or about November 22, 2007, K Line sent an email to Ghasemi entitled, "RE: [a United States Company] and [California Company 1] shipment", contained an attached file named, "DOC071122.tif".

17

The attached file was a DHL air waybill, listing "Evertop Services Sdn BHD" in the "From(Shipper)" block and "FARZEH TAJHIZ GOSTAR" in the "To(Receiver)" block.

CALIFORNIA COMPANY ORDER (2)

46. On or about December 3, 2007, Ramzi sent an email entitled, "07-15-ET-254-[California Company 2]", with an attached file named, "07-15-ET-254-[California Company 2].pdf" to a U.S. company located in Campbell, California (hereinaft`er "California Company 2"), which is located in the Northern District of California. The attached file was a purchase order on Evertop Services' letterhead for 41,900 Radiall Connectors with three product numbers: R114 186 000, R141 082 000 and R210 160 020, with a proposed purchase price of $50,000.

47. On or about January 18, 2008, Ramzi sent an email entitled, "Your TT of 51450 USD done- Please confirm receipt", to California Company 2. A review of bank records that showed that on or about January 16, 2008, Evertop Services wired $51,425.00 through Maybank Bukit Bint to California Company 2's Wells Fargo bank account, located in Campbell, California.

48. On or about January 26, 2008, CALIFORNIA COMPANY 2 filed an SED indicating that EVERTOP SERVICES, located in Malaysia, was the ultimate consignee for $51,430 worth of electric resistor parts being shipped from Los Angeles, California to Malaysia, and that no license was required for the

18

shipment.

49. On or about February 4, 2008, K Line filed an IranAir air waybill to ship Invoice No. 07-15-ET-254 from Evertop Services in Malaysia to I.C.I. in Iran. An email sent on February 5, 2008, from K Line to Kakavand contained an attached file named, "DOC080205-002.pdf". The attached file was a scanned copy of an IranAir air waybill, listing "Evertop Services Sdn BHD" in the "Shipper's Name and Address" block and "Iran Communications Industries (I.C.I.)" in the "Cosignee's Name and Address" block. The IranAir air waybill also referenced the invoice number, "No. 07-15-ET-254".

CALIFORNIA COMPANY ORDER (3)

50. On or about January 9, 2008, Ramzi sent an email, to a United States company, located in Milpitas, California (herinafter "California Company 3), which is located in the Northern District of California, attaching a purchase order (PO # 07-15-ET-258-EPS) for inductors. Ramzi also stated that the payment for the shipment of these items would be "Cash Prior to Shipment" and that it would be sent by wire transfer.

51. On or about January 17, 2008, Ramzi sent an email referencing Purchase Order Ref No. 07-15-ET-258-[California Company 3], to California Company 3, attaching an end-use statement signed, "Alex," dated January 17, 2008, certifying in pertinent part that Evertop Services will not "use, transfer,

export, re-export, resell or otherwise dispose of any items
purchased from California Company 3 to any destination, end-user
or for any end use prohibited by the laws of the United States"
and that Evertop Services does not "ship to any countries that
are against US laws."

52. According to California Bank and Trust records, on or
about March 7, 2008, Evertop Services, wired $17,855 from its
account at Maybank in Malaysia, to California Company 3's
California Bank and Trust account located in Milpitas,
California.

53. On or about March 29, 2008, California Company 3 filed
an SED indicating that the ultimate consignee for the shipment of
$17,875 worth of inductors being shipped from California to
Malaysia, was Evertop Services in Malaysia, and that no license
was required for the shipment.

54. On or about April 7, 2008, Kakavand sent an email to K
Line attaching a Commercial Invoice for I.C.I., that included,
among other items, 2500 inductors, with a total value of 16,500
Euros, and advising K Line to ship the items on the "first
available Iran Air flight." In his email, Kakavand indicated
that the inductors were from [California Company 3].

55. On July 2, 2008, a federal seizure warrant issued by
United Stated Magistrate Judge in the Northern District of
California (Misc 3-08-70399-MEJ), based on alleged violations of

20

IEEPA and ITR, was served on a freight forwarder for a shipment
that included, among other items, 2500 inductors purchased by
Evertop Services from California Company 3.

RECENT ACTIVITES OF EVERTOP SERVICES AND KAKAVAND

56. Information from email correspondence indicates that
Kakavand continues to expand his procurement network creating new
intermediate companies. A portion of an email dated on June 12,
2008, and entitled, "New connection & relation" is as follows:

> Yesterday Alen called me & informed about the situation
> related to the new connections, Let me explain, they already
> started to contact through the new account which you kindly
> arranged for them [Email Account 3] and under the "B.B.I",
> just for your information we offered an Armenian name:Armen
> Vartanyan) and my friends using it now, so if somebody
> called and asked about Armen, you or the office employee
> could ask about the the[sic] name of the Co. & the
> responsible person to call back, but they'll inform us about
> the main requests in order to coordinate.
>
> I'll ask Mr. Majid to call you and explain to you by
> himself.

Moreover, an email dated May 11, 2008, indicates that Kakavand
sought to create a new company in Malaysia as he instructed an
associate to check the availability of business names registered
in Malaysia. A portion of the email is as follows:

> Per our tel speaking below please find the names with their
> priorities:
>
> 1. Vertex Technology Sdn Bhd
> 2. Zenith Technology Sdn Bhd
> 3. Summit Technology Sdn Bhd
> 4. Microsun Technology Sdn Bhd
>
> The priorities are as per the numbers above from 1 to 4.

Please check and upon availability, please prepare the forms until we can sign them. I'll speak to you tomorrow afternoon to take the revised forms and sign for rest of the works.

Regards
Majid

57. Prior to his arrest, Kakavand and Evertop Services appeared active in attempting to acquire United States origin items by creating new intermediate companies. On November 12, 2008, SA Harris received information from a United States Company located in Flemington, New Jersey (hereinafter "New Jersey Company 2"), that indicated Evertop Services is continuing to seek and acquire United States origin technology. The affiant was informed by a representative of New Jersey Company 2, that it had received sales orders through its Australian representative in which the end user was Evertop Services and the ultimate destination for the goods was reported to be Malaysia.

58. Majid Kakavand is an Iranian male, born on June 22, 1972, in Tehran, Iran. He is the holder of an Iranian passport.

59. I have identified the photograph attached as Exhibit A as being a photograph of Majid Kakavand. This photograph is contained in Kakavand's passport (Iranian Passport Number I5829185). United States law enforcement obtained this copy of Kakavand's passport pursuant to the email search warrant (Misc. No. 3-08-70256-JL). The email message identified the attachment as Kakavand's passport and was sent from Kakavand to his co-

22

conspirator Amir Ghasemi.

60.   On March 20, 2009, I was informed by the ICE Attaché in Paris France that the Police aux Frontières (PAF) (French border police) arrested Majid Kakavand based on a provisional arrest request from the United States.   Officers from the PAF arrested Kakavand upon his entry into France at Charles de Gaulle International Airport, where Kakavand presented his Iranian passport as identification.

61.   This affidavit is sworn to before a Magistrate Judge of the United States District Court, Northern District of California, who is a person duly empowered to administer an oath for this purposes.

_____
CLAYTON WRIGHT
Immigration and Customs Enforcement

Sworn and subscribed to before me, this 20 day of April, 2009.

_____
HOWARD R. LLOYD
United States Magistrate Judge
Northern District of California

23

